TICE, Appellant, v. SUPREME LODGE KNIGHTS OF PYTHIAS, Respondent.

St. Louis Court of Appeals, July 5, 1904.

1. LIFE INSURANCE: Fraternal Beneficiary Societies: Classification of Insurance Companies. The statutes of this State regulate and define the different classes of companies and associations furnishing life insurance, among which are old line companies, assessment companies and fraternal beneficiary societies, and classify them according to the presence or absence in their corporate organizations and mode of business of certain features decisive of their essential character.

2. ———: ———: ———: Statutory Amendments. Since the decision of the case of Toomey v. Supreme Lodge, 74 Mo. App. 507, 147 Mo. 129, in which the Court of Appeals and the Supreme Court held the Endowment Rank of the Supreme Lodge of the Knights of Pythias of the World was a regular insurance

company and subject to the provisions relating to such companies, including the provision that suicide of an insured should be no defense to an action on a policy, the statutes have been changed so as to provide different tests for determining whether such society is a fraternal beneficiary society, though it retains the same constitution and rules as it had when that decision was rendered.

3. ———: ———: ———: **Methods of Raising Money.** Under the present statute fraternal beneficiary societies are not restricted to assessments and dues as the only means of raising money to pay benefits, but they may raise the same from other sources such as admission fees and donations.

4. ———: ———: ———: **Statutory Tests.** Under the present statute, the tests of a fraternal beneficiary association are whether there is an absence of profit seeking in its plan, whether it possesses a lodge system, a representative government, a ritual and confines its benefits to members; the Endowment Rank of the Supreme Lodge of the Knights of Pythias possesses those features now required by the statute, and the reasons for holding it an old line insurance company, presented in the case of Toomey v. Supreme Lodge, no longer exist, it is therefore a fraternal beneficiary association such that suicide of an insured contrary to the contract of insurance and by-laws of the order, is a defense to an action on the benefit certificate (R. S. 1899, secs. 1408-1423).

5. ———: ———: ———: ———. Section 1423, Revised Statutes 1899, which excludes from the class of fraternal beneficiary associations "Masons, Odd Fellows, or similar orders paying only sick, disability or funeral benefits" does not exclude the uniform rank of Knights of Pythias, because it pays death benefits.

6. ———: ———: ———: **Profit Sharing.** Where the constitution of the Endowment Rank of the Supreme Lodge of the Knights of Pythias provided "that it should not engage in any business for gain, the purpose of said corporation being fraternal and benevolent," that its property should not be "divided among the members, but descend to their successors for fraternal and benevolent purposes," and that the funds of the Endowment Rank should be used to pay expenses and legitimate death losses, the company could not be said to be organized for profit; neither does the fact that its reserve fund exceeds its constitutional limit affect its character as a fraternal beneficiary association.

Appeal from St. Francois Circuit Court.—*Hon. James D. Fox,* Judge.

Tice v. Knights of Pythias.

AFFIRMED AND CERTIFIED TO SUPREME COURT.

*Pipkin & Swink* for appellant.

*R. P. & C. B. Williams* for respondent.

STATEMENT.—The suit is on a certificate of insurance issued to John P. Tice by the defendant corporation, in which certificate Madison M. Tice, the father of John Tice, is named as beneficiary. In his application for insurance John Tice agreed that the general laws, rules and regulations of the Order should be made a part of the contract of insurance. The application contains the following clause:

"It is agreed that if death shall result by suicide, whether sane or insane, voluntary or involuntary, . . . then there shall be paid only such a sum in proportion to the whole amount of the certificate as the matured life expectancy at the time of such death is to the entire expectancy at the date of acceptance of application by the Board of Control; the expectation of life based upon the American Experience Table of Mortality in force at the time of such death to govern."

Section 1, article 6, of the laws of the Order is as follows:

"If the death of any member of the Endowment Rank heretofore admitted into the first, second, third or fourth classes, or hereafter admitted, shall result from suicide, either voluntary or involuntary, whether such member shall be sane or insane at the time, . . . then the amount to be paid upon such member's certificate shall be a sum only in proportion to the whole amount as the matured life expectancy is to the entire expectancy at the date of admission to the Endowment Rank; the expectation of life based upon the American Experience Table of Mortality in force at the time of such death to govern."

The answer alleged that John Tice committed sui-

cide by shooting himself with a pistol. The issues were submitted to the court who, after hearing the evidence, found for the defendant. Plaintiff appealed.

To facilitate the trial a stipulation agreeing to the following facts was filed, to-wit:

"That John P. Tice departed this life on the eighth day of October, 1900; that he committed suicide by shooting himself with a pistol. That after the issuance of said certificate and up to the time of his death, he paid all monthly payments, dues and assessments as required by said certificate and the laws of the Order. And that after his death, to-wit, on the thirty-first day of December, 1900, proofs of death were forwarded to the defendant at Chicago, Illinois. That said certificate has not been paid.

"It is further stipulated that before this suit was brought, the defendant tendered to the plaintiff herein the sum of sixty-six dollars ($66) being the amount claimed by the defendant to be due under said policy or certificate, and since the institution of this suit has paid said amount into this court, with its answer. And that amount is the true amount due on said policy or certificate if the contention of defendant is sustained by the court.

"That the defendant at the time of the issuance of the certificate here sued on, and at the time of the death of the said John P. Tice defendant had complied with the provisions of the Act of 1897, page 132, required of foreign companies and was authorized by the Superintendent of Insurance of the State of Missouri to do business in this State under the Act of 1897, as a Fraternal Beneficiary Association.

"It is further stipulated that the defendant made an extra assessment upon all the members of the Endowment Rank in May, 1892, under the laws of said order, and made an extra assessment upon all the members of said Rank in May, 1901, under the laws of said order."

The defendant was incorporated under an act of Congress passed in 1870. A special act of Congress passed June 29, 1894, in respect to the defendant, contained the following sections:

"Sec. 2. That the said corporation shall have the power to take and hold real and personal estate, not exceeding in value one hundred thousand dollars, which shall not be divided among the members of the corporation, but shall descend to their successors for the promotion of the fraternal and benevolent purposes of said corporation.

"Sec. 3. That all claims, accounts, debts, things in action or other matters of business of whatever nature now existing for or against the present Supreme Lodge Knights of Pythias, mentioned in section 1 of this act, shall survive and succeed to and against the body corporate and politic hereby created; provided, that nothing contained herein shall be construed to extend the operation of any law which provides for the extinguishing of claims or contracts by limitations of time.

"Sec. 4. That said corporation shall have a constitution and shall have power to amend the same at pleasure; provided, that such constitution or amendments thereof do not conflict with the laws of the United States or of any State.

"Sec. 5. That said corporation shall not engage in any business for gain; the purposes of said corporation being fraternal and benevolent."

The body incorporated, as shown by the certificate of incorporation, is the Supreme Lodge Knights of Pythias of the World. A board of trustees of the Supreme Lodge was created by the articles of incorporation and it is provided that no contract for the disbursement of moneys of the said Supreme Lodge shall be valid, and of any effect until ratified by the board of trustees or the financial committee. In March, 1872, the following section was added to the act of incorporation:

"That the said Supreme Lodge shall have power to establish the Uniform Rank and the Endowment Rank upon such terms and conditions, and governed by such rules and regulations as to the said Supreme Lodge may seem proper."

In 1892 defendant adopted a new constitution and provided for the Endowment Rank.

Subordinate to the Supreme Lodge, Grand Lodges (for each State) have been chartered with the following powers:

"Sec. 6.    A Grand Lodge shall exercise within its domain all power and authority not reserved to the Supreme Government by the Supreme Constitution.

"Sec. 11.    Each Grand Lodge shall have a Constitution for its own government, and shall provide such legislation as shall secure conformity to the Supreme law and to the decisions of the Supreme Tribunal from the subordinate lodges and members of the order within its domain, but a Grand Lodge shall not enact or enforce any law which shall abridge the rights or privileges secured to a member of the order by the Supreme law.

"Sec. 13.    Each Grand Lodge shall provide by law for the holding of one regular convention, and no more, in each calendar year."

Subordinate to the Grand Lodges, local lodges have been organized in cities, towns and other places where necessary.    The Order has a lodge system with ritualistic form of work and a representative form of government.

The following powers are reserved to the Supreme Lodge:

"To grant charters to Grand Lodges and to provide by law for the issue, revocation, suspension, restoration and re-issue of such charters.

"To provide by law for the institution of Grand Lodges and of subordinate lodges.

"To enact such laws as shall secure the conformity

to the Supreme law of the constitutions and laws of all Grand and subordinate lodges.

"To fix by law uniform conditions upon which the ranks of the order may be attained."

The executive power of the Supreme Lodge is vested in a Supreme Chancellor elected by the Grand Lodges. The Grand Lodges exercise all powers within their respective domains not reserved to the Supreme Lodge, and each one has a constitution of its own in harmony with the laws and decisions of the Supreme Lodge.

Sections 1 and 2, of article 12, of the laws of the Order are as follows:

"Sec. 1. The purpose of the insurance branch shall be to provide indemnity for the beneficiaries of deceased members of the order.

"Sec. 2. The insurance branch of the order shall be governed by such laws as the Supreme Lodge may enact or authorize; provided that the attainment of membership in such insurance branch shall be restricted to members of the order who have attained the rank of Knight and are in good standing in a subordinate lodge, but shall not be compulsory upon any member of the order."

One of the officers of the Supreme Lodge is the president of the Board of Control. The Board of Control has jurisdiction co-extensive with the Supreme Lodge over all matters pertaining to the insurance branch of the Order, known as the Endowment Rank. This Board of Control consists of the Supreme Chancellor and Vice Chancellor ex officio, and three members of the Supreme Lodge who must be members of the endowment rank, elected by the Supreme Lodge.

The amended laws of the Order contain the following provisions in respect to the endowment rank:

"Art. 2. Sec. 2. The Board is authorized to create, hold and disburse the funds of the Endowment Rank under regulations hereinafter provided.

"Sec. 4. The Board is hereby empowered to establish a table of rates, and, whenever deemed necessary, adjust the same, to be graded in accordance with the member's age at date of admission and the endowment held or applied for; such table of rates to be at all times applicable to the entire membership in force and to be applied as the Board may from time to time direct. The Board is authorized to make special assessments upon all members of the Endowment Rank when necessary to meet the liabilities of the Rank.

"Sec. 6. To issue certificates of membership, and provide for the payment of same in the sum of five hundred dollars ($500) one thousand dollars ($1,000), two thousand dollars ($2,000) and three thousand dollars ($3,000), as may be applied for, under the general laws enacted by the Supreme Lodge and the rules and regulations adopted by the Board of Control for the government of the Endowment Rank and the membership thereof.

"Art. 3. Sec. 8. The board shall prepare and submit a full and complete report of their acts and decisions and the condition of the Endowment Rank to the Supreme Lodge at each regular convention, and at other times to the Supreme Chancellor, if required so to do by him.

"Art. 4. Sec. 1. The funds of the Endowment Rank shall be placed to the credit of the Endowment Fund, which shall be derived from monthly payments, dues, assessments, membership fees, certificate fees, clearance card fees, and from all other sources of revenue.

"Sec. 2. Said fund shall be used for the purpose of paying the legitimate death liability, and the expense of administration, in accordance with the provisions of the Supreme Statutes and general laws, rules and regulations for the government of the Endowment Rank, and any part of said funds not required to meet current liabilities may be invested by the Board of Control, as

provided for in section 5, article III of the Endowment Rank Constitution.

"Sec. 3. Special assessments, when ·made by the Board of Control, shall be governed by the same laws, rules and regulations as are set forth for the payment and collection of the regular monthly payments, except that said special assessments shall be issued on the fifteenth day of the month, and shall be due and payable by the members to the Secretary of the Section within thirty (30) days thereafter, who shall collect at once and forward the same to the Board. of Control.

"Sec. 4. Each applicant for membership in the Endowment Rank shall, upon completion of his application for transmission to the Board of Control, pay to the Secretary of the Section, in accordance with his age, occupation and the amount of endowment applied for, a monthly payment as provided in the annexed table, and in section 5 of this article, and, if accepted, such member shall continue to pay the same amount each month thereafter as long as he remains a member of the Endowment Rank, except as provided for in section 6 of this article or unless otherwise provided for by enactment of the Supreme Lodge of Board of Control of the Endowment Rank, Knights of Pythias."

Sections 5 and 6, referred to in section 4, article 4, supra, classify the hazardous and extra hazardous risks and provide for extra monthly payments for insurance of that sort in addition to the amount required by the table of rates; also that on extra hazardous risks certificates will be written only for one thousand dollars and on hazardous for two thousand dollars. Section provides that in the event of a change of occupation the insured shall give notice and pay the higher rate—failure to do so renders the certificate void.

Section 5 of the Constitution says:

"The Board shall have power to direct the investment in readily convertible securities of all such parts

of the Endowment Fund as it may deem wise and proper, where the amount in said Fund will justify; Provided, such investment shall be limited to government, state or municipal bonds and mortgages constituting a first or prior lien on first-class improved real estate, not exceeding fifty per cent of its market value."

It was shown that on June 30, 1898, there was a cash balance and investments to the credit of the Endowment Rank of $469,460.55; on March 31, 1900, $493,-567.50; on December 31, 1900, $497,976.17; and on March 31, 1901, $489,595.82. These statements do not take into account liabilities of the endowment fund, if there were any. An exhibit of the condition of the funds of the Endowment Rank made on December 31, 1900, show a balance of cash and investments of $525,742.19, and of all liabilities on the same date of $546,500.

John H. Holmes testified that he was a resident of St. Louis; that he was the Keeper of Records and Seal of the Grand Lodge Knights of Pythias of Missouri; that the organization is under the law of the Supreme Lodge Knights of Pythias; that said organization has a ritualistic form of work which is secret and has a secret sign and password which he was not at liberty to divulge; that the membership of the Supreme Lodge Knights of Pythias extends all over the United States and Canada and wherever the order is in existence; that it has subordinate lodges in the various cities in the United States and in the Hawaiian Islands, Mexico and Cuba; that a member of the Supreme Lodge is compelled to be a member of the Subordinate Lodge; that the Grand Lodge is composed of representatives of the various lodges of the domain, and is located in each state, called a domain; that the representatives of the Grand Lodge are elected by the subordinate lodges, the members of the Supreme Lodge are elected by representatives of the Subordinate Lodges assembled in Grand

Lodge Session; that the Subordinate Lodges have a ritualistic form of work.

"A fund is created by the Grand and also by the Supreme Lodge, which said fund is paid out only in cases of sickness or death. There is no provision by which any of the funds of the Knights of Pythias can be divided among its members. The Constitution of the Supreme Lodge provides for the payment of death benefits to members of the Order through the avenues of the Subordinate Lodges."

On cross-examination 'witness further testified: "The Order is divided with reference to the ranks as follows: Rank of Page and Knight of the Subordinate Lodge, the Grand Lodge and the rank of Page in the Grand Lodge and the rank of Past Grand Chancellor in the Subordinate Lodges. There are two other branches, known as the Endowment Rank and the Uniform Rank. The funds of the Supreme Lodge do not find their way into the funds of the Endowment Rank. The Endowment Rank is not articulated in any way with the subordinate lodges except that its members must be members of the Grand Lodge and Subordinate Lodges. We insure no one except members of the Order. Our payments are termed monthly payments, dues and assessments. When the monthly payments and dues fail to provide funds sufficient to meet the obligations of the Endowment Rank, an assessment should be ordered by the Board of Control.

"The monthly dues and payments are fixed and paid monthly. The certificate used by the Endowment Rank calls for $500, $1,000 and up to $3,000. The Endowment Rank has no ritualistic form of work; it has no representative form of government and has a local form of organization; the officers are the President, Vice-President and Secretary, and their meetings are not secret. I am not as familiar with the Endowment Rank as I am with other branches of the order. I am informed

that the funds of the Endowment Rank are sometimes invested or loaned. This is shown by quarterly statements. I know of $500,000 having been loaned on interest. In 1899 and 1900 the Endowment Rank lost about $250,000; after said loss the Endowment Rank was unable to meet its liabilities. The Board of Control made an extra assessment after this loss. There are no fraternal or beneficial purposes in the Endowment Rank aside from the payment of death benefits. The only charitable object that the Endowment Rank has is in the payment of its death benefits. This the subordinate lodges also do. The rate for this kind of insurance is much lower than is charged by old line insurance companies. The Endowment Rank is under the direction of a Board of Control under the supervision of the Supreme Lodge. A great deal of charitable work is done by the Order of Knights of Pythias. (Witness gives details of said charitable work.) The fund of the Endowment Rank is not only created by monthly payments, dues and assessments, but likewise from fees from certificates, from proceeds from the sale of seals and books used by the secretaries, and from interest earned on the investments made."

"Q. You remember having heard Mr. Williams' allegation in the answer read, that the constitution of the defendant permitted it to hold $100,000 worth of property. If the Endowment Rank is under the control of and a part of the Supreme Lodge, how do you account for it holding as much as $500,000, and not in violation of the constitution and charter? "A. The Endowment Rank is a separate branch of the order, and not under the meaning, I take it, of that section of the Supreme Lodge."

The table of monthly dues for insurance shows that the holder of a certificate of the age of John Tice (twenty-nine years) was required to pay eighty cents per month for one thousand dollars of insurance. It was

shown that seven dollars per annum was the actual cost of carying a thousand dollar policy on the life of a person twenty-nine years of age, as shown by the rate books of old line companies, but that a sum considerably in excess of this was charged as a premium by the old line companies. In addition to the dues of eighty cents per month, a policy holder was required to pay a membership fee of one dollar per thousand for each thousand dollars of insurance applied for.

The funds of the Endowment Rank were divided and known as expense funds and mortuary funds. The approximate membership of the Endowment Rank is sixty thousand, while the membership of the Order was estimated at five hundred and twenty thousand. The membership is divided into ranks, such as Page, Esquire and Knight, the Endowment Rank, the Uniform Rank and the Supreme Lodge Rank. The Order pays sick benefits and a burial benefit of not less than twenty dollars on the death of a member but has no insurance feature other than the Endowment Rank.

For the foregoing recital of facts we are indebted to Judge BLAND.

The statute of 1889 to be compared with the present law reads as follows:

"Fraternal-beneficial societies may provide for the relief and aid of their members and families, widows, orphans or other kindred dependents of deceased members, or for assisting such as may be sick or disabled from the proceeds of assessments upon the members of such society or association; and to that end may issue to its members beneficial certificates, payable at such time and in such manner as shall be therein provided, and do such other things as shall be provided by the laws of the State; and such fraternal-beneficial societies shall not in any way be subject to the insurance laws of the State, nor under the control or supervision of the

123 App—7

insurance departments of the State, nor pay any corporation or other tax: Provided, that any beneficiary in a certificate issued by any such association may pay the dues and assessments charged against such member on account of his membership." [R. S. 1889, sec. 2823.]

The statutes of 1899 relating to fraternal-beneficiary associations, originally enacted to amend the law in 1897, are sections 1408 to 1423 inclusive, of which we transcribe the first:

"A fraternal-beneficiary association is hereby declared to be a corporation, society or voluntary association, formed or organized and carried on for the sole benefit of its members and their beneficiaries, and not for profit. Each association shall have a lodge system, with a ritualistic form of work and representative form of government, and shall make provision for the payment of benefits in case of death, and may make provision for the payment of benefits in case of sickness, temporary or permanent physical disability, either as the result of disease, accident or old age, provided the period in life at which payment of physical disability benefits on account of old age commences, shall not be under seventy (70) years, subject to their compliance with its constitution and laws. The fund from which the payment of such benefits shall be made, and the fund from which the expenses of such association shall be defrayed shall be derived from assessments or dues collected from its members. Payments of death benefits shall be to the families, heirs, blood relatives, affianced husband, or affianced wife of, or to persons dependent upon the member. Such associations shall be governed by this act and shall be exempt from the provisions of the insurance laws of this State, and shall not pay a corporation or other tax, and no law hereafter passed shall apply to them unless they be expressly designated therein. And such fraternal beneficial association may create,

maintain, disburse and apply a reserve or emergency fund in accordance with its constitution or by-laws."

The other material sections of the 1899 statutes authorized the continuance of associations already in operation in the State when the act of 1897 was adopted, provided the terms on which foreign associations may come in, the kind of annual reports they must make to the State Superintendent of Insurance, for service of process on them, for the issuance of permits to associations to do business and their incorporation, against the employment of soliciting agents, against the acquisition by a beneficiary of an interest in a certificate, against the seizure of certificates for debts of members or beneficiaries, for meetings of associations outside the State, penalties for non-compliance with the law, and to exempt certain societies from the force of the fraternal statutes. (Sections 1409 to 1423, inclusive.)

GOODE, J. (after stating the facts).—The legislation of this State takes notice of and regulates several classes of companies or associations furnishing life insurance, among which are regular or old line companies conducted for profit and issuing policies calling for a stipulated premium to all persons who can pass the required health examination, assessment companies which raise money to pay death losses in whole or in part by assessing their membership, and fraternal-beneficiary societies, which commonly depend, to some extent, on assessments too, for the payment of losses, but are distinguished by their social and fraternal features, lodge system, rituals and ceremonies, and by insuring only initiated members. Instead of leaving the question of whether any company writing life insurance in the State, belongs to one or the other of the different classes of companies, to be determined by the intention of the members as expressed in its charter, or by the understanding between it and those insured as to the nature

of the contract, the State's policy has been to classify such companies according to statutory definitions and the presence or absence in their corporate organization and mode of business of certain features deemed decisive of their essential character.    In deference to statutory criterions prevailing at different times, our courts have held some societies that were organized elsewhere as fraternal, and empowered by the incorporating sovereignty to write benefit certificates, to be old line insurance companies.    As the immunities and duties of the different kinds of companies are various, the character which the statutes affix to one often becomes important in litigation over its contracts and proves decisive of the rights of the parties.    An apt illustration of this is found in the career of the present defendant.    The Supreme Lodge of Knights of Pythias of the World was incorporated by an act of Congress for fraternal purposes, and empowered to organize the Endowment Rank to write benefit insurance for members of the order; and doubtless no member who ever took a certificate believed he was getting an old line policy.    Nevertheless, because of statutes then in force in Missouri, this court in Toomey v. Supreme Lodge (74 Mo. App. 507), and the Supreme Court of the State in the same case (147 Mo. 129, 48 S. W. 936), held the defendant was conducting a regular, instead of a fraternal-beneficial insurance business, was not entitled to the exemption from the general insurance laws granted by the statutes (sec. 1408, R. S. 1899) to fraternal associations, but was subject to all of them, including the provision that the suicide of an insured person shall be no defense to an action on the policy, unless it was procured in contemplation of suicide. [R. S. 1899, sec. 7896.]    The same question is presented as the controlling one in the cause before us; which must be disposed of as the Toomey case was, and on its authority, unless subsequent legislation has so altered the law as to require a decision that the defendant was writing

fraternal-beneficial, and not old line, insurance, when it contracted with the deceased, and that the certificate sued on created a contract between him and the defendant for fraternal insurance. The constitution and rules of the defendant remain as they were when the Toomey certificate was issued and a different result from the one reached in that cause, can only be justified if changes have been made in the statutes which annul the reasons for which the Supreme Court held the defendant's certificates constituted old line contracts. Construing the sections of the Revised Statutes of 1889 relating to fraternal associations and assessment companies, the Supreme Court said: "Thus under defendant's amended charter of 1892, it had power to insure the lives of members of the Endowment Rank of the order for a certain sum, upon the payment of fixed monthly premiums, and it exercised that power when it issued the policy sued on. The amount to be paid does not depend 'upon the collection of an assessment upon persons holding similar contracts,' and hence, it is not an assessment company within the meaning of section 5860; nor is the amount to be paid derived 'from the proceeds of assessments upon the members of the association,' and therefore it is not a fraternal-beneficial association, within the definition of such societies by section 2823, R. S. 1889. The premium to be paid by the insured is *fixed*, and the sum to be paid by the defendant to the beneficiary is *certain*—two thousand dollars flat. Thus whether we reason by induction or exclusion the result is the same; it is a regular old line policy of insurance and section 5855, R. S. 1899, applies and renders the defense of suicide unavailing in this case."

We understand that the controlling reason for the decision was that the statutes of 1889 classed as fraternal-beneficiary associations only those raising money to pay benefits by assessing their members; a mode of deriving revenue not exclusively, nor chiefly pursued by

the defendant, but only resorted to when other modes temporarily prove inadequate. Fraternal insurance, if not of recent origin, has but recently attained a magnitude that caused States to regulate it. The growth of associations furnishing such insurance and their experience, have altered opinions as to the best mode of conducting the business, and corresponding changes in the law have followed from time to time. The original conception of such insurance was that the consideration for it should be assessments levied on and paid by members to meet death or indemnity losses as they accrued, and that the amount of benefit paid in each instance should depend on the sum then collected, not to exceed a maximum limit. The law in this State reflected that conception at first. Many fraternal associations now exact fixed dues as a consideration for their certificates and agree to pay a certain sum when the insured member dies. Presumably, this system has come into vogue in response to a popular demand, and legislation has been enacted in this State as in others, to authorize it.

Besides the decisive fact that the defendant did not rely on assessments to pay benefits, the Toomey opinion called attention, as arguing for the old line nature of defendant's business, to the fund which the Endowment Rank had accumulated beyond the sums needed to defray current losses, and to the circumstance that in the year 1895 the benefits paid in Missouri exceeded the receipts therein.

By comparing the relevant sections of the statutes of 1889 and 1899, it will be observed that the alterations introduced by the Act of 1897 were radical and extensive, and that they go directly to the reasons which induced the ruling in the Toomey case, that the defendant's indemnity contracts were old line, instead of fraternal-beneficial. We will examine those reasons in the light of the law as it now is to see if they still hold good.

The fund to pay death benefits due on certificates

is yet obtained by the defendant otherwise than by levying assessments on members. But the present statutes, instead of restricting the association to that means of raising the fund, expressly authorize it to be raised by dues collected from members as well as by assessments (sec. 1408), and impliedly authorize its obtainment from still other sources; for among the questions fraternal-beneficiary associations are required to answer in their annual reports to the State Superintendent of Insurance is this one: "Does association guarantee in its certificates, *fixed amounts to be paid,* regardless of amount realized from *assessments, dues, admission fees* and *donations?*" This language shows that in passing the Act of 1897, the legislature did not intend benefit societies doing business in Missouri, should be restricted, in raising money to pay losses, to assessments and dues; but that they should be privileged to realize a fund from other sources — from admission fees and donations at least; and we take it that any available income naturally incident to and arising from the accustomed management of such orders, may be devoted to paying losses without putting the society outside the fraternal-beneficial class.

The argument is advanced to prove the defendant does a regular life insurance business, that it partly collects its mortuary fund from some sources not mentioned in our statutes—from clearance card fees, for instance. But this feature is of small value as a criterion of character under the present law, which lays stress on other things; and we think the Legislature had no thought of being exhaustive as to the means of raising a benefit fund, or of providing that nothing but the recited sources of revenue could be utilized on pain of frustrating the intention to conduct a fraternal beneficiary association by making it take on the obligations of an old line company. There is nothing in the statutes to compel so narrow a construction and the fact that one

section (1408) empowers the benefit fund to be gathered from assessments and dues, while another section (1411) presupposes the use of admission fees and donations, argues against it. Probably speculation and commercial hazard are to be shunned by companies desiring to enjoy fraternal privileges, but the defendant is not shown to have engaged in anything of the sort; and in truth it is doubtful if a single source of its mortuary fund, except the interest received, the effect of which will be discussed below, falls outside the meaning of the words "assessments and dues." The test of an association's fraternal nature is no longer its method of raising money for indemnities, but the absence of profit-seeking in its plan and administration, whether it possesses a lodge system, a representative government, a ritual, and confines its benefits to members. Even if a mortuary fund should be formed to some extent by *ultra vires* methods, of which we think the defendant guiltless, it is questionable if that course would affect the character of the association in a collateral proceeding on a certificate, though the State would have redress against it. The objection in the Toomey opinion that the insured was required to pay a fixed sum monthly for his certificate and that the death indemnity to be paid to his beneficiary was certain, is obviated by the present law. The question we have quoted from the Revised Statutes of 1899 recognizes a benefit company's privilege to "guarantee in its certificates fixed amounts to be paid," while question 9 of the same section and section 1408, recognize its privilege to charge periodic dues. As to those matters the rules of the defendant do not differ essentially from those of the Royal Tribe of Joseph, which we ruled in the Morton case (93 Mo. App. 78) were compatible with the fraternal beneficiary character. That association charged a fixed monthly premium, graded according to the age of the insured, for its benefit certificates, and agreed to pay a certain and unchange-

able benefit. See too, Boyce v. Royal Circle, 99 Mo. App. 349, 73 S. W. 300; McMahon v. Maccabees, 151 Mo. 522, 52 S. W. 384. The Toomey opinion dwelt on the accumulated surplus of the defendant's Endowment Rank and on the excess of payments in Missouri over its receipts from that State. But now benefit societies are empowered by section 1408 of the Statutes, to create and maintain a reserve or emergency fund; a plan which obviously makes for the security and desirability of their contracts and ought to be encouraged. But plaintiff insists that the defendant has no reserve, but only expense and mortuary funds; and it is true that no assets are set apart under the name of a reserve or Emergency Fund. But the Mortuary Fund is devoted to the payment of death benefits, and the accumulated surplus in it clearly constitutes a reserve or emergency fund within the meaning of the statute.

Nor is there significance, under the present laws, in the possibility of the payments of a society in a given locality during a year exceeding its income therein during the same period. True, this could not happen if the society was bound to rely exclusively on the assessment of members to pay losses, as societies were bound to do to be classed as fraternal under the statutes of 1889; for no more could be paid out under that system than came in from assessments. But now there are other resources in the lawful reach of a fraternal society. And in providing for the maintenance of an emergency fund, the Legislature took into consideration the possibility of extraordinary death losses during periods, which the usual income would be insufficient to meet.

It thus appears, if our reasoning is sound, that the reasons for holding the defendant to be an old line insurance company under the statutes as they stood when the Toomey case was decided, or rather when Toomey's certificate was issued, no longer exist. The legislation regarding fraternal beneficiary socities has

been remodeled and another definition and other criterions of what is fraternal insurance have been prescribed; and in truth the state policy regarding those associations has been completely changed. They are brought by the statutes now in force, under the supervision of the State Insurance department, instead of being exempt from it as they were previously; are subject to much more comprehensive state regulation and invested with wider privileges than obtained prior to the passage of the act of 1897, doubtless because experience dictated the propriety of these changes. The fact of public supervision meets an objection sometimes assigned against ranging societies like the defendant among beneficiary orders, that they would thereby be enabled to carry on an insurance business in the state free from the regulation and superintendency designed to protect policy-holders. [National Union v. Marlow, 74 Fed. 775.]

Of the present statutes, the one particularly pertinent to the matter in hand is section 1408, which defines what is meant by a fraternal beneficiary society and prescribes its essential features. These we have stated above, as the statute gives them. That the defendant possesses all the statutory requirements except one, is practically conceded by the plaintiff. It has lodges and every member must belong to a lodge; it works according to a ritual, its government is representative, it pays death benefits to such persons only as the statutes allow (viz: persons related to or dependent on the insured member for support) and insures members and no one else. True, every member is not insured, but only those who choose to join the Endowment Rank; insurance not being compulsory nor the sole aim of the Order, which is fraternal and social as well, like most associations issuing benefit certificates. But the essential fact in this connection is that no one save a member can get insurance, though all need not take it; an arrangement

that was indorsed as a lawful one for a beneficiary society to establish in Laker v. Royal Fraternal Union, 95 Mo. App. 353, 75 S. W. 705.

Our attention is directed to the opinion in Knights of Pythias v. Kalinski, 163 U. S. 294, wherein the management of defendant's Endowment Rank was said to be detached from that of its main body. But instead of holding the contracts of the Endowment Rank to be old line insurance on that account, the United States Supreme Court held positively that they were benefit certificates. That the act of 1897 intended orders like the defendant, which issue death indemnity contracts, to be treated as fraternal-beneficiary associations, seems to be *conclusively shown by its last section* (R. S. 1899, sec. 1423), which expressly excludes from the class of fraternal beneficiary associations "Masons, Odd-Fellows or *similar orders, paying only sick disability or funeral benefits.*" The defendant is a "similar order" paying death benefits.

Said section emphasizes too, the importance of the lodge system in fixing the character of an association, by excluding from the fraternal class, associations not working on a lodge system which limit their certificate holders or membership to a particular class of persons. Confining insurance to members does not suffice to render a society fraternal under our laws, and the fraternal character can be acquired only through lodges to which the members must belong and in which they may fraternize. The question of what the fraternity contemplated by the former law on this subject consists in, has received different answers from courts. In the Marlow case, supra, which dealt with the law of 1889, it was thought an association of persons engaged in the same avocation, like the Brotherhood of Locomotive Engineers, was meant by the words "fraternal-beneficial." In Franta v. Bohemian, etc., Union, 164 Mo. 313, 63 S. W. 1100, it is said: "In the invitation that our statute gives

to the people to form such societies, it does not specify what sentiments or bonds of union may be used for that purpose. Whatever sentiment a number of men may have in common and peculiar to themselves, which draws them together for a purpose that is not immoral or inimical to the State, may be made by them essential to membership in their society." In that case the defendant order required, as a condition of membership, that a person should be a communicant and perform the rites of the Roman Catholic Church. This religious communion was held to be a lawful bond of fraternal union and failure to observe the church rites a cause for suspending a member's benefit certificate. The nature of the tie that unites an order is of less moment under the present statutes, as they distinctly enunciate the characteristics of a fraternal beneficiary association in a section (1408) separate from the one (1394) describing benevolent societies generally; which was not done in the statutes of 1889 nor until 1897.

Plaintiff's counsel rely mainly on the proposition that the defendant is shown to run its business at a profit and that this fact deprives it of the status of a fraternal beneficiary association, because section 1408 of the statutes declares such an association to be one "formed or organized and carried on for the sole benefit of its members and their beneficiaries and not for profit." The defendant association fits that definition. It is not a profit-making or profit-sharing concern; and whatever money it raises and accumulates redounds to the benefit of its members and their beneficiaries, either by defraying the expenses of the order, paying funeral benefits, which are incident to all memberships, or discharging liabilities or certificates. The statutory privilege of gathering a reserve, implies the right to lift the receipts above the current disbursements and in that sense to earn a profit. But the profits the statutes intend shall exclude an association from the fraternal beneficiary

class are such as the stockholders or members of an insurance company expect to receive as dividends on shares, additions to the amounts called for by their policies, or in other ways that benefit them financially. In speaking for the court on this point in the Morton case, Judge BLAND said:

"These benefit certificates are not policies of insurance of the old-line type, and the monthly dues are not paid as so much premium in consideration of so much insurance contracted to be paid at the death of the insured, from which dues it is expected by both parties that the insurance company will derive a profit. The certificates are not issued with a view that the association may make a profit thereby, but for the purpose of securing mutual protection without profit to the association; and herein again is the insurance widely distinguishable from the premium plan for a profit. Toomey v. Supreme Lodge K. of P., 147 Mo. 129; Jacobs v. Life Association, 146 Mo. 523, 48 S. W. 462; Wallace v. Bankers' Life Assn., 80 Mo. 102; National Union v. Marlow, 74 Fed. 775; Knights of Pythias v. Kalinski, 163 U. S. 294, relied on by appellant, did not have under review the law of 1897, and are inapplicable to the law and facts which control the case at bar."

There have been legislative efforts for twenty years or more, to place benefit societies on a sound working basis, so that their indemnity agreements could be relied on without forcing them into the position of regular life insurance companies; as is shown by the successive statutes passed during the period between 1879 and 1897. The course of most of this legislation is traced in Hanford v. Assn., 122 Mo. 50, 26 S. W. 680, and Toomey v. Supreme Lodge, 74 Mo. App. 507; and in appraising the present force of any decision, the state of the statutory law when the contract considered was made, is to be carefully noticed. For instance, State ex rel. v. Mer. Ex., 72 Mo. 158, and State ex rel. v. Citizens' Assn., 6

Mo. App. 162, dealt with defendants claiming to be benefit societies prior to the passage of statutes conferring the right on associations to do business in Missouri as such. The written law bearing on these companies was not only greatly amplified by the Act of 1897, but the marks of distinction between them and regular life insurance companies were made more definite and somewhat changed. Concerning the meaning attached by the Legislature to "profit-seeking" in furnishing life insurance, there seems to be little doubt, if we construe the word "profit" as used in section 1408 in connection with its use in other sections *in pari materia* as relating to regular life companies. These are divided into three classes; first, those having a capital stock and whose stockholders also share in the profits; second, those having no stock, but in which the policy-holders get the profits, and third, those having stock but whose stockholders and policy-holders both participate in the profits (R. S. 1899, sec. 7883.) A distribution of the profits earned by such companies is allowed. [Sec. 7881.] The charter of the defendant is significant on the question of its being a profit-seeking enterprise or not. We find a section (5) reading as follows: "That said corporation shall not engage in any business for gain, the purpose of said corporation being fraternal and benevolent." It is difficult, in the face of such a charter, to hold that the defendant was "formed or organized and carried on for profit." In an amendment of the charter June 29, 1894, it was provided (sec. 2) that its property should not be "divided among the members, but descend to their successors for fraternal and benevolent purposes," and the constitution says (art. IV, sec. 2) the funds of the Endowment Rank shall be used to defray expenses and legitimate death losses. These provisions appear to render profit-sharing impossible. The assertion that great profits accrued to the Endowment Rank between 1891 and 1902 is based on the statement of assets in the for-

mer year worth sixty-nine thousand dollars while in the
latter they rose to four hundred and ninety-seven thou-
sand.   But these figures ignore the outstanding liabil-
ities and take account of only disbursements actually
made.   The liabilities have sometimes amounted to more
than the available resources so that assessments became
necessary.   The wisdom of providing a considerable re-
serve for these associations to fall back on in periods
of depleted income, has been learned from experience.
An increased death rate as the insured members grow old,
failure to add new members as rapidly as was expected,
and other disappointments in business, frequently em-
barrass benefit societies and assessment companies, which
rarely, if ever, have a surplus beyond their needs.   A
tendency to lay up a fund against vicissitudes has de-
veloped and met with legislative sanction, as we ob-
served above.   As to assessment companies, the statutes
provide the amount of reserve they shall carry.   [R. S.
1899, sec. 7905.]

In view of our statutes expressly legitimizing such
a system, the defendant's reserve is not so much relied
on to impugn its fraternal character as is the investment
of the accumulation in interest-bearing securities, which
policy is said to be palpably a profit-seeking and profit-
making one.   It may result incidentally in gaining a
profit; but no person will say the association was organ-
ized, or is carried on, simply to lend its reserve, and
the statute does not refuse it the beneficiary character
unless it was organized or is carried on for profit.   The
prime object of the order seems to us to be to benefit
members and their lawful beneficiaries, and drawing in-
terest on a reserve to be a minor detail of its business.
Moreover, we think it would be an unreasonable inter-
pretation of the statutes to say they bespeak a purpose
on the part of the Legislature to have a society's reserve
lie in its coffers instead of earning interest.   The inten-
tion was to prevent profit-seeking insurance companies

from operating under the guise of fraternal orders; not to prevent the latter from handling their reserves providently. And here it may be said in response to the argument based on the amount of defendant's reserve, that the statutes do not make that a test of the defendant's character nor fix a maximum limit for the reserve. The definite test of this phase of the question is whether the association is carried on for profit, commercially speaking, or solely for the benefit of members and beneficiaries.

Minor reasons for holding the defendant a beneficiary association instead of a regular life insurance company are that it was incorporated to do business as the former; that Congress authorized the creation of the Endowment Rank that the defendant might through said branch, provide for the payment of indemnities to the beneficiaries of insured members, and that all the rules of the Rank and the forms of its contracts convey the notion of benefit insurance.

It is said by the plaintiff's counsel that defendant's "contract of insurance is not such as a fraternal beneficial association gives, but contains all the elements of an old line insurance contract." If the defendant is a fraternal order under our statutes and its contracts are left to speak for themselves, free from a construction forced by holding it to be an old line company, this statement is erroneous. Regular insurance companies are not restricted as to the class of persons who may be payees of their policies, as the defendant's constitution restricts it. The payee of a regular policy has a vested interest in it, whereas the certificate in suit shows on its face that the plaintiff had no vested interest but might have been displaced by the designation of another beneficiary. Regular policies do not require the insured to belong to an order and comply with its rules, or to be over twenty-one and not over fifty years of age, and able to read and write, as do the defendant's cer-

tificates. There is no such provision for carrying a certificate for a member who lapses in his dues, as this defendant has. [Constitution, art. VI, sec. 1.] The rates charged for regular insurance are much higher than the defendant charges. Perhaps other differences might be pointed out, while we think of no resemblances except the fixed dues and the certain benefit which, as has been shown, rest on statutory warrant. The applications signed by members asking for certificates in the Endowment Rank show that benefit insurance was expected and paid for.

A point is made in regard to the charter of the defendant permitting it to hold only one hundred thousand dollars worth of property, whereas the statements of the Endowment Rank disclose larger holdings. If that clause of the charter has any bearing on the funds of the insurance branch, which we seriously doubt, a transgression of it might be a ground to revoke the charter, or for some other interference by the United States, but has no relevancy to the question of whether the Order furnishes fraternal or old line insurance.

We conclude that its contracts are fraternal beneficiary, exempt from the statutes limiting the defense of suicide, and hence by force of the admitted fact that the deceased committed suicide, the judgment below was for the right party. It is affirmed. *Reyburn, J.,* concurs; *Bland, P. J.,* dissents and because he deems the decision in conflict with the decision of the Supreme Court in Toomey v. Supreme Lodge, 147 Mo. 130, asks that this case be certified to the Supreme Court for determination. It is so ordered.