MARGARET ANNE BURKE, Respondent, v. GRAND LODGE A. O. U. W., Appellant.

Kansas City Court of Appeals, March 29, 1909.

1. BENEFIT SOCIETIES: By-Laws: Custom: Waiver. Fraternal societies may waive provisions of its own by-laws in regard to forfeiture for failure to pay premiums within the strict requirements, since the general rules of waiver and forfeiture are the same in association insurance as in ordinary insurance.

2. ———: ———: ———: ———. A member is presumed to know the laws of the society and its conduct of business, but may look to the general conduct of the society itself in the observances of its laws and when a practice is approved by the company itself the latter is estopped to take advantage of a member's reliance thereon.

3. ———: ———: ———: ———: Evidence. Evidence in regard to payment of dues and the custom of the society to pay the same out of its general funds is reviewed and the by-laws are held to have been modified by the custom, and the members had a right to rely on the custom until notified differently.

Appeal from Jackson Circuit Court.—*Hon. Walter A. Powell*, Judge.

AFFIRMED.

*H. L. Jost* and *F. H. Bacon* for appellant.

(1) The doctrine contended for here is that, if an officer of the subordinate lodge, or the subordinate lodge itself, pays assessments for a member, at his request, either as a loan or a gift, such member, if the grand lodge officers have knowledge of such a transaction, is thereafter privileged to pay or not to pay, as he pleases, and if he does not pay, no suspension results. If this doctrine be true, no subordinate lodge can, out of its own funds, assist its unfortunate members in any way, if the grand lodge officers know of it, without thereby wiping out the laws of the superior body relative to the prompt payment of assessments. In the case of Franta v. Bohemian, etc., Union, 164 Mo. 312, Judge VALLIANT referred to the work of fraternal orders in caring for unfortunate members. (2) Suspension results *ipso facto* from non-payment of an assessment at the agreed time. Harvey v. Grand Lodge, 50 Mo. App. 472; Curtin v. Grand Lodge, 65 Mo. App. 277; Lavin v. Grand Lodge, 104 Mo. App. 1-17. (3) No officer of a subordinate lodge has power to waive the positive requirements of the laws of the order. Harvey v. Grand Lodge, 50 Mo. App. 472; Lavin v. Grand Lodge, 104 Mo. App. 19; Borgraefe v. Knights of Honor, 22 Mo. App. 141; Kocher·v. Supreme Council, 65 N. J. L. 649, 48 Atl. 544, 52 L. R. A. 861; Coughlin v. Knights of Columbus (Conn.), 64 Atl. 224. (4) It appearing from the uncontradicted evidence that Burke had abandoned the order, it was immaterial what the lodge had been in the habit of doing. Lavin v. Grand Lodge, 112 Mo. App. 1; Glardon v. Supreme Lodge, 50 Mo. App. 54; Sheridan v. Modern Woodmen (Wash.), 87 Pac. 127.

*W. W. Calvin* and *W. S. Gabriel* for respondent.

(1) William F. Burke did not abandon his membership in the defendant order. (2) The practice of appellant of accepting assessments, after the time pro-

vided by its by-laws, constitutes a waiver of the provision that failure to pay same when due operates as a suspension of the member *ipso facto;* and, this strict provision being waived, it became necessary for the lodge to give notice and take definite action in order to effect a suspension. Harvey v. Grand Lodge, A. O. U. W., 50 Mo. App. 472; McMahon v. Maccabees, 151 Mo. 537.

JOHNSON, J.—Plaintiff, the widow of William F. Burke, deceased, brought this suit on a benefit certificate issued by defendant, a fraternal beneficiary society incorporated in this State. In 1897 Burke became a member of Summit Lodge No. 272 of said order at Kansas City and defendant issued to him the benefit certificate in suit, by the terms of which the grand lodge promised to pay plaintiff, the beneficiary, two thousand dollars on the death of the member, on condition "that said William F. Burke shall in every particular, while a member of said order, comply with all the rules, laws and requirements thereof now existing or hereafter enacted." Burke died December 28, 1905. Plaintiff contends that he was a member in good standing at the time of his death, while defendant claims, in its answer, that on account of failure to pay an assessment duly made and payable on November 28, 1905, Burke was suspended and forfeited the benefit certificate. Further, it is claimed by defendant that after said suspension and forfeiture, Burke voluntarily abandoned his membership in the order. The reply of plaintiff is a general denial. At the close of the evidence introduced by plaintiff, the court gave the jury a peremptory instruction to return a verdict for defendant. Plaintiff took a nonsuit with leave and, in due time, filed a motion to set it aside. One of the grounds of the motion was newly-discovered evidence. This ground was supported by affidavits. The court sustained the motion on this ground alone and defendant appealed.

It is argued by counsel for defendant that with the facts stated in these affidavits added to those adduced at the trial, plaintiff still has failed to show a right to recover on the certificate. In our statement, we shall treat the facts appearing for the first time in the affidavits as though they were supported by evidence introduced at the trial. We do this because no point is made, nor does it appear, that the plaintiff was not diligent in the discovery of the new evidence, or that it was merely cumulative.

The bill of exceptions recites that plaintiff "made out a prima-facie case by the admission of the benefit certificate, the death on December 29, 1905, of William Francis Burke" and that defendant then assumed the burden of proof. After defendant offered evidence in support of the affirmative defenses interposed by its answer, plaintiff introduced her evidence on the issues thus raised, after which the court instructed a verdict for defendant. In the application for membership, dated April 19, 1897, Burke agreed "that compliance, on my part with all the laws, regulations and requirements which are, or may be hereafter enacted by said order, is the express condition upon which I am entitled to participate in the beneficiary fund and have and enjoy all the other benefits and privileges of said order."

It is admitted Burke was born November 17, 1857, and, therefore, was in his fortieth year when he became a member and received his certificate. The laws of the order required him to pay regular monthly assessments which, in 1905, were $3.50 each. Of this sum, fifty cents went to the local lodge for its expenses and $3 to the grand lodge on account of the "Guarantee Fund" out of which death benefits were paid. These fixed assessments were as regular as clockwork and were due and payable by the member on the 28th day of each month. They were payable to the financier of the local lodge who was charged with the duty of forwarding, at stated times, the portions due the grand lodge. Law

197 of the order provided: "A failure or neglect of any member to pay any assessment on or before the 28th day of the month in which the same is payable to the financier of his subordinate lodge, or to the Grand Recorder, as provided by law, shall work *ipso facto* a suspension and forfeiture of all rights under any beneficiary certificate issued to him to whomsoever the same may be payable, and no action on the part of the lodge or any officer thereof shall be required as essential to such suspension and forfeitures. Any member suspended or expelled from the order for any cause whatever, forfeits all claim to the beneficiary fund during suspension or expulsion."

It is admitted that Burke failed to pay the assessment due November 28, 1905, a month before his death, and that he was reported as suspended at the meeting of the local lodge on the night of December 7th, but plaintiff endeavors to avoid the forfeiture by showing that the right to claim it under the provisions of Law 197 was waived by defendant by reason of the practice of the local lodge, known to and acquiesced in by the managing officers of the grand lodge, of accepting payments of assessments long after they became due. The financier of Summit Lodge testified that Burke's assessments for March and April, 1905, were paid May 28th, those for July, August and September of that year were paid September 20th. Burke was not suspended for these delinquencies for the reason given by the witness that a member in good standing "stood up for him." In such cases, it was the practice of the local lodge to pay the assessments due the grand lodge out of its own funds and the member was not reported to the grand lodge as delinquent. We quote from the financier's testimony:

"We made a practice of carrying delinquent members without suspending them if a brother got up and stood good for them. The account of Mr. George Weissinger, page 11, shows that the dues for January, Feb-

ruary and March, 1905, were paid August 28th. I do not know who stood good for him. There should have been somebody, I never carried anybody unless there was. I have no record as to who did it. On page 11 it shows that the dues of Mr. J. M. Wallace for March were paid April 5th. He was not suspended for March because he was carried. Brother Reed was up there and stood good for him. I was right there. The same party stood good for him for other months. It was not always some one who stood good, sometimes one and sometimes another. I never carried men unless some-one stood good for them, they were suspended if no one would volunteer. By standing good, I mean they would pay for him and stood up for him, and not say that he was all right. I do not remember that Mr. Reed paid for these various delinquents. I did not suppose he stood good for all of them. I do not recol-lect all of them. Sometimes they may have said that, they would pay the account. On page 110, C. D. Upde-graff, shows the June assessment was paid July 19th. I can tell exactly who stood up for him, it was B. L. Gould who paid for him. I expect he paid for all these delinquents in that list. It was very probable he was delinquent in June, August, November and December, 1905, because Brother Gould paid for him a great many times. He paid the assessments as they came due. I presume the total amounts to something like $15. It was a common practice to carry these delin-quents if there was anybody who stood good for it. . . . One of our duties is to keep the lodge alive, and we carried delinquents as far as we could. I can-not tell in the particular instances who stood for the delinquents. They did not say they were all right, said they would stand good for them, and we credited them. . . . One man was carried from January to August. It was done a great many times."

It appears from the testimony that the practice of granting these indulgences was very common. Further,

it appears that it was not carried on secretly but to the contrary was given some prominence in lodge meetings, partly for the purpose of building up the membership by encouraging the belief that a worthy member in sickness or misfortune would be treated benevolently and not by the harsh rule provided in Law 197. The witness, whose affidavit was given in support of the motion to set aside the nonsuit, states that the practice came under the personal observation of managing officers of the grand lodge at times when such officers visited meetings of the local lodge. On one of such occasions, the deputy granted master workman spoke in open lodge and praised the lodge "for its generosity in carrying its delinquents out of its general fund." The receiver of the lodge was the person to whom Burke generally paid his assessments and was the member who "stood up for him" when he became delinquent from time to time. He refused to stand up for him when Burke was in his last illness and most needed the favor. He had promised Mrs. Burke, the plaintiff, that he would see that her husband was never suspended. He testified: "During these months (July, August and September, 1905), I was responsible for the money. Mrs. Burke asked me to see that he was never suspended and I did so. I told her that I would. I did not give notice to him or her or anybody when he was suspended. I do not give anybody notice. I did not tell her that I would not stand good any further."

Provisions in the laws of a fraternal beneficiary society for the enforcement of prompt payment of assessments levied for the support of the benefit fund are regarded by the courts as necessary to the proper maintenance of the order and the accomplishment of one of the important and highly beneficent objects of its existence. A law of the order prescribing a forfeiture of the benefit certificate held by the member as a penalty for his failure to pay, when payable, dues and assessments provided by his contract, is reasonable and will

be reasonably enforced by the courts. [Harvey v. Grand Lodge, 50 Mo. App. 472; Curtin v. Grand Lodge, 65 Mo. App. 297; Lavin v. Grand Lodge, 104 Mo. App. 1.] Stipulations to insure the prompt payment of the benefit assessments constitute the substance and essence of an insurance contract of a beneficial association. [Modern Woodmen v. Tevis, 117 Fed. 369.]

Since the laws of defendant order did not permit subordinate lodges or their officers to alter or waive any of the general laws especially those of the essence of its insurance contracts, we agree with defendant that the custom of the subordinate lodge of which Burke was a member, of permitting members to remain delinquent in the payment of their dues and of preventing their suspension and the forfeiture of their insurance by paying their grand lodge assessments out of funds in their own treasury, could not, of itself, and without the knowledge and approbation express or implied, of the grand lodge, operate as a waiver of the provisions for the forfeiture of the insurance and the suspension of the member appearing in General Law 197. But we think if this custom was brought to the notice of managing officers of the grand lodge and instead of being reprobated, received either express approval or that approval which should be implied from silence, the general law must be regarded as modified by the recognized custom.

Such is the view expressed by the Supreme Court in McMahon v. Maccabees, 151 Mo. 522, where it is said:

"A fraternal society doing a limited life insurance business as the law permits may waive the provisions of its own law in regard to forfeiture of the insurance on account of failure to pay premiums within the strict requirement. 'The general rules of waiver and forfeiture are the same in association insurance as in ordinary insurance.' [Citing cases.]

"A member of such society is presumed to know its laws, and the contract of insurance is to be construed as having been made under the limitations of those laws. But a member has a right to look to the general conduct of the society itself, in respect of the observance of its laws, particularly those relating to his own duties, and if the society by its conduct has induced him to fall into a habit of non-observance of some of its requirements it cannot without warning to him of a change of purpose, inflict the penalty of failure of strict observance. A member dealing with a subordinate officer of the society, knowing his duties to be prescribed by law, has no right to rely upon the act of that officer, if he should attempt to waive a requirement which under the law he has no right to waive. But when he has dealings of that kind with such officer and those dealings are of such a nature that they must pass under the observation of those who have in charge the ultimate management of the company's affairs to such an extent as to justly induce the member to believe that the practice is approved by the company itself, the company is estopped to take advantage of the situation.

"It is essential to the life of these societies, that the members pay the assessments promptly, as their laws require. As a general rule, it is cheap insurance, its cost is calculated at the lowest rate at which it can be carried, and if the society is lax and its officers carry the sentimental feature of its organization too far into its business management, it is liable to fail of its beneficent purpose. But the duty of guarding against such misfortune is primarily on the officers who are entrusted with its management at the head, and if they permit lax dealing of their subordinate officers to the degree of misleading a member, the responsibility must rest upon the society."

But it is argued by counsel for defendant that "the grand lodge had no power or control over the funds of the subordinate lodge belonging to its general fund.

If the subordinate lodge had the power to use its own funds as it pleased whether with or without the knowledge or consent of the grand lodge, no such knowledge of how it used its funds could affect it in any way. The knowledge of such custom on the part of the grand lodge is as immaterial as it would be if it knew that a stranger was paying the assessments for a member. . . . It appears from the evidence that the assessments were always promptly paid to the grand lodge and so long as the assessments were paid to the grand lodge, it was absolutely immaterial who paid them."

We do not sanction this proposition. The subordinate lodge, unlike a stranger, was under the supervision and control of the grand lodge. The grand lodge could interdict the custom and put the local lodge under ban if it disobeyed. It had the power and exercised it of regulating and controlling its subdivisions and their members. It would be unjust and inequitable to say that the grand lodge might receive the benefits from a custom in derogation of its laws and then repudiate the obligations necessarily resulting from such custom. The effect of its approval of the custom was to say to Burke: "The grand lodge encourages the beneficent practice of your local lodge of preventing suspensions and forfeitures by giving aid from its treasury to its unfortunate but worthy members. You need not fear a forfeiture if you bring yourself within the pale of this custom." We have here all the elements essential to a waiver. The course of dealing of the subordinate lodge became the course of dealing of the head lodge. Burke had a right to rely on it and to act on the supposition that he would not be summarily deprived of this important benefit without notice. On the hypothesis of facts presented by the evidence of plaintiff the automatic forfeiture of the insurance provided in Law 197 was destroyed by the custom under consideration and no suspension or forfeiture could be declared without notice to the member.

On the subject of the abandonment of the order by Burke, we find the evidence presents an issue of fact for the jury to solve. The court acted properly in setting aside the nonsuit.

The judgment is affirmed. All concur.