KATE GALVIN, Respondent, v. KNIGHTS OF FATHER MATHEW (a corporation) Appellant.

Kansas City Court of Appeals, February 17, 1913.

1. FRATERNAL BENEFICIARY ASSOCIATIONS: Expulsion: Waiver. The plaintiff sued to recover as a beneficiary on an insurance certificate issued by the defendant, a fraternal beneficiary society, to her husband. The husband had been a member of the society for several years, and had taken a pledge to abstain from intoxicating liquor. He did, however, continue, or, return to, the use of intoxicating liquor, which was within the knowledge of some of the members and officers of the local council of which he was a member; but he had never been expelled according to the laws and by-laws of the society, and his assessments and dues were collected from year to year and no question of the validity of his insurance raised prior to his death. *Held*, that since the use of intoxicating liquors by the insured.

after he became a member was known to the defendant, the forfeiture was waived.

2. ———: **Laws and By-Laws.** The laws of a fraternal beneficiary society having a representative form of government are in the nature of a contract between the members, and all are bound by the provisions, by reason of the assent of the members in assuming the obligations and duties of membership.

3. ———: **Forfeiture: Condition Precedent.** The agreement of a member of beneficiary society to follow a specified line of conduct on pain of forfeiture of the rights conferred on him and his beneficiary is in the nature of a warranty—a condition precedent—and as such demands a strict compliance as an essential condition to preservation of such rights.

4. ———: **Local Council: Waiver.** It is not within the power of the local council, its recorder or any other officer of the organization to waive or dispense with any of the requirements of the societies, which relates to the very substance of the contract.

5. ———: **Waiver of Forfeiture: Evidence.** The general rules of waiver of forfeiture are the same in association insurance as in ordinary insurance. Waiver depends solely upon the intention of the party against whom it is invoked and is in that respect essentially different from estoppel. If the evidence adduced clearly tends to show an intention to waive the forfeiture, it is immaterial for the purpose of establishing a waiver whether such intention was communicated to the assured or not.

6. **PLEADING: Evidence: Compliance with the Policy.** When the petition alleges compliance "with all the conditions in an insurance policy required to be performed," proof of waiver is admissible.

7. **WITNESS: Evidence: Contracts.** The object of section 6354, R. S. 1909, is to place parties upon an equality, so that one shall not be permitted to testify in transactions cognizant to both, when the other can no longer be heard.

Appeal from Jackson Circuit Court.—*Hon. Jos. A. Guthrie*, Judge.

AFFIRMED.

*Frank P. Walsh, James P. Aylward* and *I. M. Lee* for appellant.

(1) (a) It was not within the power of the local council, its recorder or any other officer of the organiza-

169 Mo. App.—32

tion to waive or dispense with any of the requirements of the appellant's order which related to the very substance of the contract. Lavin v. Grand Lodge, 104 Mo. App. 18; Boyce v. Royal Circle, 99 Mo. App. 355; Borgraefe v. Knights of·Honor, 22 Mo. App. 141; Harvey v. Grand Lodge, 50 Mo. App. 477; McCoy v. Insurance Company, 152 Mass. 272; Knights of Honor v. Oeters, 95 Va. 615. (b) The testimony was insufficient to constitute a waiver of the by-laws. Burke v. Grand Lodge, 136 Mo. App. 457; Stiefel v. Life Ins. Assn., 55 Mo. App. 233. (c) Waiver is an affirmative defense and under the law it is necessary to plead waiver when it is relied upon as basis of recovery. Nivert v. Railroad, 232 Mo. 639. (2) The court erred in admitting the testimony of the plaintiff as to the conversation with the recorder of the subordinate council which respondent contends constitutes a waiver of by-laws for the reason that the recorder of the subordinate council was dead and plaintiff was not a competent witness as to any admission, declaration or agreement he may have made. Sec. 6354, R. S. 1909; Williams v. Edwards, 94 Mo. 451; Darks v. Grocery Co., 146 Mo. App. 254; Real Estate Co. v. Building Co., 196 Mo. 370. (3) (a) Plaintiff's instruction 2 is erroneous and should not have been given for the reason that the subordinate council nor its officers had any power to abrogate or waive the by-laws. Borgraefe v. Knights of Honor, 26 Mo. App. 141; Charwick v. Order of Triple Alliance, 56 Mo. App. 463; Harvey v. A. O. U. W., 50 Mo. App. 477. (b) The instruction was further erroneous because there was no evidence upon which to base it.

*G. W. Duvall, Fyke & Snider* and *E. W. Shannon* for respondent.

The knowledge of McGuire was defendant's knowledge and the acts of McGuire were the acts of

defendant, for it is admitted he was defendant's employee, its treasurer at the local branch and not shown anywhere in the record his authority was in any respect restricted. And it being his duty to collect assessments made by defendant against Galvin with knowledge of Galvin's habits, he, of course, knew defendant's customs and said for defendant, by continuing to make collections, knowing Galvin's habits, such practices were not objected to. Defendant is now estopped from making objections thereto. Advertising Co. v. Wanamaker, 115 Mo. App. 270; Gruwell v. K. L. of S., 126 Mo. App. 496; McMahan v. Maccabees, 151 Mo. 522; Shultice v. Modern W. of B., 120 Pac. 531. Waiver though an affirmative defense is not required to be pleaded in insurance cases. Such has been the rule in this State for many years and the authorities therein are numerous. In other cases the rule is different. Nickell v. Ins. Co., 144 Mo. 432.

JOHNSON, J.—This is an action on a death benefit certificate issued by a fraternal beneficiary society incorporated under the laws of this State. The allegations of the petition relating to the character of the contract of insurance end with the statement that defendant is a life insurance company and that on February 26, 1903, it issued to James J. Galvin a policy or certificate of insurance ''by which it promised to pay Kate Galvin, plaintiff herein, the sum of $1000 upon the death of the said James J. Galvin.'' The answer alleges, in substance, that defendant is a fraternal beneficiary society, that it issued the certificate as such, and that the rights of the member and of plaintiff, his beneficiary, had been forfeited before his death by his violation of a certain rule of the society which prohibits its members from using intoxicants. Plaintiff filed a reply in the nature of a general denial. The cause was tried on the issues thus raised and verdict and judgment were rendered for plaintiff in ac-

cordance with the prayer of the petition. Defendant appealed.

The facts of the case are as follows: The defendant society was organized and is carried on for the sole benefit of its members and not for profit. It has a lodge system with ritualistic form of work and representative form of government. The highest body in the government is the supreme council, located in the city of St. Louis and composed of its officers and the representatives of the various subordinate councils. Among the officers of the supreme council are three trustees who are the custodians of the property of the supreme council and have certain prescribed duties relating to the conduct of the affairs of the order. The expressed objects of the society are:

"First, to unite fraternally, practical male Catholics, and to give all possible moral and material aid in its power to its members, and those depending on them, by holding moral, instructive and scientific lectures, by giving musical and literary entertainments, by assisting its members to obtain employment and by encouraging them in the pursuit of their profession, trade or occupation, and to provide means, from the proceeds of assessments upon its members wherewith to assist its sick and disabled members or for the relief and aid of families, widows and orphans, or other beneficiaries of its deceased members or both, as may be hereafter enacted. Second, to encourage all persons, by advice and example, to abstain from all intoxicating drinks and to cement the bonds of charity and union that should exist among all Catholics."

One of the by-laws requires each member to take the following pledge: "I promise, with Divine assistance, to abstain from all intoxicating drink, including cider, malt and fruit liquors, and to discountenance by advice and example, intemperance in others; and I do further pledge myself to faithfully obey and support the constitution, laws, by-laws, rules and reg-

ulations of this order, and labor to the best of my ability to advance its objects and to promote the welfare, spiritual and temporal, of my fellow members."

Another by-law deals with violations of this pledge in the following manner:

"Sec. 80. Any member violating the pledge shall be, by the very act, suspended, and when proved guilty, shall be expelled; the expulsion to date and take effect from proved date of violation of pledge.

"Sec. 81. The suspension shall work deprivation of all rights and claims of membership pending trial.

"Sec. 82. Any member cognizant of such violation, and failing to report the same, shall be removed, suspended or expelled, at the discretion of the council."

Other by-laws provide that a charge against a member for a violation of this pledge shall be made to the subordinate council (local lodge) of which he is a member and there tried. A member tried and found guilty is given a right to appeal to the supreme council. Further it is provided that a member found guilty may be reinstated to membership by his subordinate council on certain specified conditions that do not appear to be very onerous.

James J. Galvin became a member of a subordinate council in Kansas City in February, 1903. In his written application for membership and for a beneficiary certificate he agreed to "conform in all respects to the laws, rules and usages of the order now in force or which may hereafter be adopted," and that "my violation of total abstinence pledge . . . shall forfeit the rights of myself and family or dependents to all benefits and privileges therein."

And in the certificate issued to him the obligation of defendant to pay the death benefit was made dependent on the condition "that the statements contained in his application for membership and medical

examination are true and that he complies in the future with the laws and regulations of said order."

The following questions and answers appear in the application: "Do you use morphine or opium in any form? No. Tobacco? Yes. Alcohol or other stimulants? Yes. If so, to what extent? Moderate. What has been your habit in respect to either through life? Drink occasionally."

Galvin died in May, 1910. He had continued his membership in the order, had not been charged with a violation of his pledge and had paid all dues and assessments. He was in the plumbing business in Kansas City and usually paid his dues and assessments at his office to the treasurer of the subordinate council who called there to collect them. Plaintiff was the wife of Galvin and worked in the office as book-keeper. Sometimes she made the payments to the treasurer and she states that he (the treasurer) "dropped in our office nearly every day. He would be going down town to his work and he would call in." Over the objection of defendant she was permitted to testify that about a year prior to Galvin's death the treasurer asked her if he was not drinking. She replied in the affirmative and said she wanted him to drop the insurance. The treasurer said, "No. You keep up the insurance. There will be a time when your husband will quit drinking."

One of the grounds of defendant's objection to this testimony was the alleged disqualification of plaintiff on account of the death of the treasurer prior to the trial. Witnesses were introduced by defendant from whose testimony it appears that Galvin, while not an habitual drunkard, continued to his death in the use of intoxicants. He was a daily visitor of dramshops, kept intoxicating liquors at home and frequently appeared to be more or less intoxicated. In her testimony plaintiff admitted that he had not kept his pledge and the evidence on that issue is so one-sided

that we shall accept as proved the contention of defendant that Galvin was a constant user of intoxicants. Indeed we believe defendant proved the fact so well that one cannot understand how his indulgence in the habit could have escaped the notice of his acquaintances including his fellow lodge members. One of defendant's witnesses says "he had a florid complexion and appeared to be bloated about his face and body. I talked to him about his drinking and admonished him to abstain from drinking." Other witnesses describe him as having the appearance and manners of a drunken man even when sober. The proprietor of his favorite dramshop said of him: "He was a somewhat peculiar man and I have known men to say, 'Who is that drunk over there' and I knew that he hadn't taken a drink for a month. He was a loud-mouthed fellow and cutting up all the time and I heard them say 'Who is that —— drunken Irishman' when he wasn't drinking at all. I don't think his own wife could tell when he was drunk."

Shortly after the death of Galvin the Supreme recorder wrote the following letter to the treasurer of the subordinate council who had collected the assessments: "I received startling information today from a member at Kansas City, Mo., concerning the late Brother James J. Galvin of your council. The writer states that it was a notorious fact about Kansas City that the deceased was anything but a temperate man and was known as a 'Boos Fighter,' and that the majority of members were unaware of the fact that he was a Knight of Father Matthew, until they noticed the same on this month's assessment call.

"Any information you have concerning this deceased brother would be appreciated, and if these charges are substantiated we will undoubtedly contest the payment of this claim. Please investigate immediately and let me hear from you."

It appears from this letter that the inebriety of Galvin was "a notorious fact about Kansas City" which, we take it, means that it was generally known to Galvin's friends and acquaintances. The answer of the treasurer which was introduced in evidence by defendant is as follows: "In reply to your letter of the 6th inst. will say that I was much surprised at the contents of your letter. I was not on speaking terms with James J. Galvin for three or four months prior to his death, his wife making the payments of his dues and assessments. I have known him intimately for the past ten years save the last three or four months and don't know of ever having seen him take a drink. If he was a *boos* fighter I did not know it. He has belonged to our council since February 26, 1903, and no one ever reported him for drinking. He has two brothers in the saloon business in this city and your informant may have gotten him confused with one of them. Brother Galvin was a jovial, whole-souled man and I did not think he had an enemy on earth. I hope the story is not true."

This letter is an example of the artful use of the negative pregnant, worthy of Talleyrand himself. "I don't know of ever having seen him take a drink," could and probably would have been true had Galvin been the worst of drunkards. "If he was a *boos* fighter I did not know it," is a statement equally evasive. We do not know what a *"boos* fighter" is but infer it has reference to an extreme if not the last degree of habitual inebriety. All the statement amounts to is that Galvin was not that far gone in his cups. It contains no refutation of the charge that he had violated his pledge. Neither does the next sentence, "He has belonged to our council since February 26, 1903, and no one ever reported him for drinking," which is merely an argument to the effect that since the laws of the order required members to report such delinquents and no report had been made, the

officers of the lodge had no official information of the existence of the ground of forfeiture. The next sentence conveys the idea that a mistake has been made, the next intimates that the charge is the work of some malicious enemy of the dead man and the final sentence expresses the hope that "the story is not true," which must refer to the story of Galvin having been a "*boos* fighter" since no less a charge is discussed.

The correspondence, considered with the other evidence to which we have referred, justifies an inference that the officers of the subordinate council knew that Galvin, during the whole period of his membership, was not observing his pledge and in the face of such knowledge suffered him to retain his membership and to pay his dues and assessments year after year, obviously in the belief that his "notorious" fault was being condoned by his fellow members and superiors.

One of the witnesses was a supreme trustee living in Kansas City. He was present in the lodge the night Galvin was initiated and thereafter saw him on an average of once a week "around on the streets." He testified: "Q. Did you know whether or not Galvin was a drinking man? A. Well, I never saw Mr. Galvin take a drink, but I have saw him, the last two or three years of his life, in a condition that would indicate that he was not entirely sober. Q. In other words, you have seen him under the influence of liquor? A. I don't know that he was under the influence of liquor, not having seen him drink any. Q. Well, that was the impression you got? A. That was the impression." Afterward the witness stated in answer to a question asked by counsel for defendant that he "hadn't any idea that he (Galvin) was a member of the order at the times that I saw him, the last two or three years of his life." ·

At the conclusion of the evidence the court refused the instruction asked by defendant and gave the following instructions at the request of plaintiff: "The

court instructs the jury defendant's subordinate council at Kansas City, Missouri, was its agent authorized by it to collect dues and assessments from members and to suspend, try or expel members for violation of defendant's rules, and any act of the said subordinate council in respect to its dealings with members in such matters must be considered the act of defendant and binding upon it.''

''The court instructs the jury, although you may find after becoming a member of the defendant order, and at the time of his death, the deceased, James Galvin, drank intoxicating liquors yet if you believe from the evidence defendant or its subordinate council or the officers of said subordinate council, knew of such practices on the part of said Galvin, and afterwards with such knowledge collected dues and assessments from said Galvin on account of his membership and continued to treat him as a member of said subordinate council and of the defendant, defendant thereby waived its right to complain of such practices on the part of said Galvin, and plaintiff is not prohibited from recovering thereby.''

The principal contention of counsel for defendant is that the court erred in overruling the demurrer to the evidence offered at the close of the evidence.

From the instructions we have copied it appears that at the trial plaintiff, in effect, conceded that Galvin, in the repeated violation of his pledge, had committed an act which *ipso facto* forfeited the policy and that plaintiff could not recover but for the waiver of such forfeiture by the officers of the subordinate council, which waiver consisted of the collection and retention of dues and assessments and of the retention of Galvin in the membership of the order after defendant knew that he was recreant and would continue to disobey one of its laws of prime importance.

The constitution and laws of the order became a part of the contract between Galvin and defendant.

not only by operation of the express stipulation to that effect in the application and certificate, but also for the reason that the laws of a fraternal beneficiary society having a representative form of government are in the nature of a contract between the members and "all are bound by the provisions by reason of the assent of the members in assuming the obligations and duties of membership." [Smith v. Knights, etc., 36 Mo. App. 184.] On becoming a member Galvin voluntarily pledged himself to abstain from the use of intoxicating drinks. He knew that total abstinence was one of the fundamental rules of the order and that a violation of the pledge would do more than afford a cause for the forfeiture of his membership and rights under his beneficiary contract. *Ipso facto* it would suspend him from membership and during suspension would deprive him and his beneficiary of all rights under the benefit certificate. The law was self-executing and is one the courts should enforce. As is well said in Smith v. Knights, supra:

"It manifestly appears that suspension was made a *result* of the violation of the pledge, and was not to be brought about by the judgment of the council to which deceased belonged. So far as the *suspension* of a member was concerned it is quite apparent that it was intended that the law should be self-executing. The *expulsion* of a member only followed after it had been established by evidence that the member had violated the law. This would necessarily involve a trial. If the law of the order only provided that expulsion should work a forfeiture of all rights under the certificate, then the right of recovery would be clear; but as we have seen, *suspension* is sufficient to take away the right; and that a violation of the pledge of total abstinence by a member, of itself, resulted in a suspension and a deprivation of all rights of membership. This is a reasonable regulation, because the fundamental principle of the order is to prevent its members

from using intoxicating liquors. The language used, both in the' laws of the society and the application for membership, is so plain and unambiguous, that no room is left for construction. It must be presumed that each member fully understood the nature of his contract with defendant and knew the penalty for the violation of its fundamental law.''

The agreement of Galvin to follow a specified line of conduct on pain of forfeiture of the rights conferred on him and his beneficiary was in the nature of a warranty—a condition precedent—and as such demanded strict compliance as an essential condition to the preservation of such rights. [Hogins v. Supreme Council, 76 Cal. 109; May on Insurance, pp. 160-161; Royal Templars v. Curd, 111 Ill. 284; Ellerbe v. Faust, 119 Mo. l. c. 658; Pauley v. Modern Woodmen, 113 Mo. App. 481.]

If this were a case where the violation of the agreement of the member to follow a specified course of conduct had been unknown to the society we would hold as did the St. Louis Court of Appeals in the Smith case, supra, that the death benefit certificate had been forfeited and that plaintiff had no cause of action thereon. But as we have shown, the evidence strongly supports the inference that Galvin's use of intoxicants, which may fairly be said to have been continuous, was so pronounced and notorious that it must have been and, in fact, was known to the officers and membership of the subordinate council of which he was a member and that instead of treating him as a suspended member and putting him to his trial before the council, they ignored his fault, indeed, condoned it, and, treating him as a member in good standing, collected dues and assessments from him year after year and raised no question of the validity of his insurance until after his death.

Counsel for defendant argue that ''it was not within the power of the local council, its recorder or

any other officer of the organization to waive or dispense with any of the requirements of the appellant's order which related to the very substance of the contract." [Citing Lavin v. Grand Lodge, 104 Mo. App. 18; Boyce v. Royal Circle, 99 Mo. App. 355; Borgraefe v. Knights of Honor, 22 Mo. App. 141; Harvey v. Grand Lodge, 50 Mo. App. 477; McCoy v. Ins. Co., 152 Mass. 272; Knights of Honor v. Ceters, 95 Va. 610; Burke v. Grand Lodge, 136 Mo. App. 457.]

The rule of these cases is aptly stated in the following excerpt from the opinion in McCoy v. Insurance Co., supra:

"But even if the officers of the corporation had attempted to waive the by-laws in this particular, which was of the substance of the contract, we are of opinion that they had no authority so to do. This is a corporation which does not make contracts of life insurance with strangers, but arranges a system of payments for the benefit of the relatives of its deceased members. It adopts by-laws to determine the relations of the members to one another, and also their rights against the corporation. The principles which apply to ordinary mutual insurance companies in regard to the waiver of by-laws by officers are equally applicable to this corporation. [Bolton v. Bolton, 73 Maine, 299; Swett v. Citizens Relief Society, 78 Maine, 541.] It is well settled that the officers of a mutual insurance company have no authority to waive its by-laws which relate to the substance of the contract between an individual member and his associates in their corporate capacity."

The rule thus announced would be given application here were we dealing with an instance in which an attempt had been made to exempt an incoming member from an obligation common to all members and of the very essence of the insurance contract. A fraternal beneficiary society necessarily must be democratic in organization and government and must practice no

favoritism among its members and a person becoming a member is chargeable with the knowledge that no officer has authority to offer him special privileges.

But our concern in the present case is not with a question of any special privilege granted Galvin in his contract with the order, but is with the issue of a forfeiture which is claimed to have resulted from his nonperformance of one of the contractual duties imposed on him. There is an essential difference between an unauthorized agreement to exempt a member from the performance of a duty common to all members and the act of forgiving an erring member who violated his obligation and thereby subjected himself to the pain of forfeiture. The prime object of the order was to foster the practice of total abstinence from the use of intoxicants. In his application Galvin confessed that he was a consumer of such beverages. It is a fact of common knowledge that such practice frequently becomes a fixed habit before its victim has even a suspicion of his bondage.. Defendant did not refuse to receive tipplers as members and its officers must have known that neither a pledge of total abstinence, no matter how strong, nor the imposition of a penalty for its violation, no matter how severe, would operate in all cases as a sufficient barrier against the impulse of present desire. They also knew that the cause of sobriety is not always promoted by inflexible hardness in the treatment of an offender. The laws of the order in giving authority to subordinate councils to reinstate members who had violated their pledges were intended to ameliorate the hard letter of the forfeiture law and to give a worthy but erring brother another chance to walk in the straight and narrow path. In other words these laws read as a whole disclose the policy of investing such subordinate council with a discretion in the treatment of cases of pledge violation and we are not going too far when we say that the plenary power of reinstatement thus conferred seems

to carry with it the power of dispensing with a formal trial and reinstatement.

But if the laws of the order were less liberal and in themselves held out no hope of mercy to the guilty we still must hold that the evidence in its aspect most favorable to plaintiff shows that defendant waived the forfeiture. The rule is now settled in this State that "The general rules of waiver of forfeiture are the same in association insurance as in ordinary insurance." [McMahon v. Maccabees, 151 Mo. l. c. 537.] "A member of such society" say the court, "is presumed to know its laws and the contract of insurance is to be construed as having been made under the limitations of those laws. But a member has a right to look to the general conduct of the society itself, in respect of the observance of its laws, particularly those relating to his own duties, and if the society by its conduct has induced him to fall into a habit of nonobservance of some of its requirements it cannot without warning to him of a change of purpose, inflict the penalty of strict observance."

To the same effect is our opinion in Burke v. Grand Lodge, supra. It is said in Stiefel v. Life Assn., 55 Mo. App. l. c. 233: "Waiver depends solely upon the intention of the party against whom it is invoked and is in that respect essentially different from estoppel . . . If the evidence adduced clearly tends to show an intention to waive the forfeiture, it is immaterial for the purpose of establishing a waiver whether such intention was communicated to the assured or not."

The evidence before us clearly bespeaks such intention. Defendant knew that Galvin had violated his pledge and with such knowledge continued to treat him as a member in good standing and to collect his dues and assessments. It would not be heard to say that it regarded him as a member for purposes of revenue but not as a member entitled to the benefits

of the order.   An intention to waive the forfeiture will be presumed from defendant's conduct as portrayed by the evidence of plaintiff.

But it is argued that the supreme council had no knowledge of Galvin's guilt and that the subordinate council had no authority to waive a forfeiture.   That would be true if the laws of the order had not invested the subordinate council with such authority.   [McMahon v. Maccabees, supra; Burke v. Grand Lodge, supra.]   But since complete authority was given the subordinate council to deal with cases of the violation of the total abstinence pledge and to reinstate guilty members and since we find in the laws of the order no express prohibition against the waiver of forfeitures on this score by subordinate councils, we think the subordinate council in this instance did have authority to waive such forfeiture.

Point is made that waiver is not an issue in the case as it was not pleaded in the answer.   The petition alleges compliance "with all of the conditions in said policy required to be performed."   The rule is that proof of waiver is admissible under an allegation of that character.   [Nickell v. Ins. Co., 144 Mo. l. c. 432, and cases cited.]

The demurrer to the evidence was properly overruled.

It is argued that the court erred in overruling the objection of defendant to certain parts of plaintiff's testimony, but we think the point is not well taken. The ground of the objection is that plaintiff was disqualified under the statute (section 6354) from testifying to a conversation she had with the treasurer of the subordinate council on the subject of her husband's violation of his pledge but, conceding for argument that the objection was well grounded at the time it was made, we think it was waived by the subsequent introduction by defendant of the letter written by the agent who died before the trial in which the precise

subject of plaintiff's testimony was covered from the agent's viewpoint.

"The object and spirit of the statute," say the Supreme Court in Coughlin v. Haeussler, 50 Mo. 126, "is to place parties upon an equality, so that one shall not be permitted to testify in transactions cognizant to both, when the other can no longer be heard." But where the testimony of the deceased party has been preserved and through it he may be heard, the disqualifying rule does not obtain and it was held in the case from which we have just quoted that where the testimony of the deceased party was taken at a former trial and preserved in a bill of exceptions, the living party was not disqualified from giving testimony at a subsequent trial. The reason of this decision would seem to apply with equal force to a case such as the present where the deceased person's version of the transaction exists in an evidentiary form and was offered in evidence by the party whose agent he was in the transaction. To hold otherwise would be to put plaintiff on an inequality with defendant, a result not intended by the statute since defendant would have the benefit of the agent's statement relating to his knowledge of a ground of forfeiture and plaintiff would be precluded from testifying to the contrary.

We find no prejudicial error in the record and the judgment is affirmed. All concur.