VALLIANT, J.
Tbe defendant is a fraternal society, chartered under tbe laws of Michigan, and issues benefit certificates in tbe nature of life insurance policies on tbe lives of its members for tbe benefit of their families. John C. McMahon, now deceased, was a member of tbe defendant society, and Mary McMahon, tbe plaintiff, is bis widow. In bis lifetime, and while be was a member, tbe defendant issued to plaintiff’s husband a benefit certificate for $3,000 payable to her at bis death upon condition that be complied with tbe laws of tbe order. His death occurred in October, 1893, and proof thereof was duly tendered, but the defendant refused to pay tbe policy, and this suit resulted.
Tbe defendant, in its answer, pleads two defenses. Tbe first is, that tbe laws of tbe society require of each member holding a benefit certificate tbe payment monthly of an assessment which is due on tbe first of each month, with thirty-days’ grace, and if not paid within tbe thirty days tbe member stands suspended from all rights and benefits in tbe order; that plaintiff’s husband was a member of tbe order on tbe first day of July, 1893, when an assessment known in tbe order as assessment No. 90 came due, which was not paid then, nor within tbe thirty days of grace and that after that by tbe laws of tbe order a tender of payment must be accompanied with a physician’s certificate of health; that in like manner on tbe *532 first of August assessment No. 91, and on the first of September No. 92, came due and that neither was paid on the respective dates nor within the thirty days of grace, and that any tender of payment thereafter was required to be accompanied with a physician’s certificate of good health, whereupon the plaintiff’s husband ceased to be a member and was not reinstated before his death.
The second defense pleaded is to the effect that the laws ■of the order provide that claims of this Mnd'shall be presented to a board of trustees from whose judgment an appeal may be taken to the supreme tent, the judgment of which is final, and no suit at law or in equity can be maintained against the order; that plaintiff presented her claim to the board of trustees, and their judgment being against her she appealed to the supreme tent whose judgment was also against her, and the matter is res adjudicata.
The reply, was to the effect that plaintiff’s husband paid ■assessment No. 90 on August 24th,'No. 91 on September 1st and No. 92 on October 26th, 1893, and that defendant received the payments and waived the production of a physician’s certificate and waived the prompt payment as called for by the laws. The reply also referred to the presentation of the plaintiff’s claim to the board of trustees, and her appeal to ■the supreme tent, and averred that she was not thereby precluded from suing on her claim in the courts of the land.
• Upon the trial the plaintiff’s direct testimony made a prima facie case. The defendant then undertook to prove its affirmative defense. The by-laws of the defendant corporation on the points in issue were read.
By the laws which went into effect July 1st, 1893, it is provided that the assessments shall be due on the first day of each month, and must be'paid within thirty days thereafter to the finance keeper of the tent; that any member failing to pay the monthly assessment within thirty days shall stand suspended; that the finance keeper shall, immediately after the *533 expiration of the thirty days, report to the supreme record keeper the names of all members who failed to pay their monthly assessments, on the blank form prescribed for that purpose, and also report the same to the tent at its next regular review. That a member not in good standing and under suspension from the benefits of the order for non-payment of any assessment, may be reinstated without any action of the tent, by paying, within ten days from the expiration of the date of payment, all assessments and dues owing by him. After the expiration of ten days, and before sixty days from date of suspension, a certificate of good health must be furnished; and after sixty days and before six months a complete medical examination.
It was the duty of the record keeper of the tent to notify members in arrears on account of an assessment for 30 days, and also to notify the commander of those in arrears in open tent, and within 'two days after suspension of a member to notify the supreme record keeper on a form provided.
By section 235 of the laws of 1893 it is provided that the subordinate tent shall be the agent of its members in making out application for membership, admission of members, the collection and transmission to the supreme tent of all dues and assessments, and that the supreme tent shall not be liable for any negligence in these matters, nor be bound by any irregularity or illegal action on the part of the subordinate tent. And by section 236 it is provided, that the supreme tent shall not be liable for the illegal receipt of arrears of death assessments from suspended members or those in arrears, and the receiving of any such arrears and receipting therefor by any officer of a subordinate tent, and the reinstatement of any suspended member, except as provided in the laws, shall not be binding-on the supreme tent.
It was shown by the evidence, that McMahon, who resided at Columbus, Nebraska, joined Adasa Tent, located at *534 Lincoln, Nebraska, on June 2, 1893, the two cities being about sixty miles apart. At the time of bis admission be paid the June assessment, which was No. 89. The next assessment, No. 90, payable within thirty days after July 1st, he paid on August 24th — fifty-four days after it was due — in the presence of Ered "W". Stevens, who was at that time the deputy supreme commander for the State of Nebraska. No medical certificate was shown to the finance keeper or Stevens, at the time the payment was made, nor was anything said to McMahon by either, that if he did not pay assessment No. 91, within six days, that is, by the thirtieth, he would be suspended.
Section 18 of defendant’s laws, is as follows: “Section 18. The supreme commander shall preside at all reviews of the supreme tent and enforce all laws thereof; he shall have the general superintendence of the order, with power to grant dispensations, when the good of the order may require it, except for the admission of unqualified persons to membership.”
Section 41 is as follows: “Section 41. Deputy supreme commanders are the representatives of the supreme commander in the territory under their jurisdiction, and it shall be their duty to see that the work of the order is performed uniformly, and when requested by the subordinate tent, or ordered by the supreme commander, instruct them in the work and lectures, and install the officers of subordinate tents. They shall also perform such other duties as the supreme commander shall from time to time direct. They shall report their official actions, on the blank form provided by the supreme record keeper, to the supreme commander, within five days after the institution of a tent, and at the close of each month. They shall be provided with commissions, to be granted by the supreme commander, attested by the supreme record keeper, under the seal of the supreme tent, and when officially visiting subordinate tents under their jurisdiction, must have said commission in their possession. They shall give bonds in *535 such amounts as the board of trustees shall determine, for the faithful performance of their duties, and shall receive such compensation for their services as shall be fixed by the board of trustees.”
The collections made by the finance keeper of Adasa Tent, for assessment No. 90, were forwarded by the record keeper to the supreme finance keeper on August 30th. This -was done by Stevens, who besides being a deputy supreme commander, was also record keeper of Adasa Tent. The report which accompanied the remittance, and which is signed by both Stevens and the finance keeper, does not include McMahon’s name in the list of suspensions.
Assessment No. 91 was payable within thirty days from August 1st, and according to the receipt, was paid by McMahon on September 10th. It is probable, however, that this assessment was in fact paid later than September 10th, for a letter written by the finance keeper on September20th to McMahon, advised the latter that if he did not pay his assessment ■* before September 25th, he would be suspended.
“Lincoln, Neb., Sept. 20, ’93.
“Bro. Sir Knight, J. O. McMahon, Columbus, Neb.
“Assessment number 91 was called August 1st and must be paid before September 25, otherwise you will be suspended. Please remit $3.00 and receive receipt for same. Yours fraternally, Wm. H. Arnold, F. K.”
The money from this assessment was forwarded to the supreme finance keeper on September 2'Ttk, together with a statement of suspensions, likewise signed by Stevens, and the finance keeper, but it does not contain McMahon’s name.
On the morning of October 26th, McMahon purchased a money order at Columbus, for the amount of assessment No. 92 ($3), and mailed it to the finance keeper at Lincoln, where it arrived that evening and was received by the latter either that evening or the next morning. In the afternoon of the same day McMahon was accidentally killed. The officers of *536 the tent and Stevens upon learning of McMahon’s death, consulted a lawyer, and then on October 30th, returned the money order by registered mail to McMahon’s widow; but she refused to accept it and the money order has never been collected by anyone.
The remittance to the supreme tent of the collections on assessment No. 92 by the record keeper of Adasa Tent was made on October 30th, and the report accompanying it states that McMahon was suspended on October 1st.
A letter written by Stevens, on June 22d, to McMahon is as follows:
“Lincoln, Neb., June, 22, ’93.
. “J. O. McMahon, Esq., Columbus, Neb.
“Dear Sir Kt.: Herewith I inclose you your certificate of membership, which please acknowledge so that I will know that you got it. Am sorry about the delay, but they have been rushed at headquarters, having had over 20,000 increase for the first five months, of this year. Tour next assessment will be due .and payable on or before the 10th of August. Remit to John R. Perkins, E. IL, 229 North 10th Street, or to me. Tours fraternally, F. W. Stevens.”
There was also evidence showing that the officials of Adasa Tent had received from other members, assessments out of time without requiring medical certificate.
The order of conducting the business as directed by the by-laws was for the supreme record keeper to call in on the first of every month the assessment for the month previous, the thirty days’ grace having then expired; and it was the duty of the record keeper of the tent, who in this instance was Mr. Stevens, the deputy supreme commander for the State of Nebraska, to immediately send in to the supreme record keeper a report in prescribed form, giving, among other information, the names of members suspended for failure to pay the assessment. If this law had been complied with the supreme record keeper would have been informed August 1st, 1893, that *537 plaintiff’s husband was delinquent on assessment No. 90, and suspended for its non-payment, and again on September 1st, for failure to pay No. 91, and still again on October 1st, for failure to pay No. 92. But the report on the July assessment that should have gone in on August 1st, was not sent until August 30th, that for August was delayed until September 27th, and that for September until October 30th, and there was no report of McMahon’s delinquency or suspension in either of the reports until that of October 30th, which was after his death and after the tent officers who made the report knew that he was dead. There was no report to the commander in open tent that McMahon was delinquent and no notice to him that he was delinquent, as section 77 requires.
The by-laws of the order also contained provisions to the effect that the board of trustees shall have power to pass on all death claims arising from the death of a member holding a supreme tent benefit certificate; fix the mode of hearing the claim, and provide that the decision of the board shall be binding unless an appeal is taken to the supreme tent, and that the decision of the supreme tent shall be final, and no suit in law or in equity shall be commenced or maintained by any member or beneficiary against the supreme tent.
At the close of the evidence, at the request of the plaintiff, the court gave the following instructions:
1. If the jury find for the plaintiff they will allow to her the sum of three thousand dollars, with interest thereon at six per cent per annum from June 22d, 1895, to this date, and compute the same, and state the entire amount in one sum.
2. The court also instructs the jury that the certificate of membership which was filed with the petition in this'cause, and has been read in evidence by the plaintiff, is proof that McMahon was in good standing with the order at the time when said certificate was issued, and that the law presumes that such good standing continued thereafter, and the burden of proof is upon the defendant to show, to the satisfaction of the *538 jury, that at the time of his death the said McMahon had lost his good standing in the order.
If the jury are satisfied from the evidence that it had not been the practice of the finance keeper of Adasa Tent to exact prompt payments of assessments when due; that he and said tent had allowed assessments to remain unpaid several days or weeks after they became due, and then accepted payment of the same, without requiring McMahon to submit a physician’s certificate, and if the jury also, from the evidence, believe and find that the deputy supreme commander of the defendant order for the State of Nebraska at the time knew of this practice of said finance keeper of said tent, and made no objection thereto, then these are facts from which the jury may find that the defendant waived literal compliance with the conditions as to punctual payment of assessments and furnishing such certificate.
The court of its own motion gave the following instruction, to wit:
3. The court instructs the jury that the burden is on plaintiff to prove by a preponderance of the evidence, the following facts: That the plaintiff’s husband, John C. McMahon, was a member of Adasa Tent No. 6, located at Lincoln, Nebraska, and the holder of certificate No. 804 for $3,000; that he complied in every particular with the laws of defendant’s order, or that defendant, having knowledge of the receipt by the finance keeper of Adasa Tent of the deceased’s assessment without a certificate of good health, after the time when, by the defendant’s laws they were due, or while he stood suspended, waived a full and prompt compliance with its laws.
4. If the jury believe from the evidence that at the time the assured, John O. McMahon, was admitted to membership in the defendant order he paid assessment No. 89; that the assessments thereafter followed in numerical order; then the court instructs the jury that under the rules of defendant in force on July 1st, 1893, assessment No. 90 was due July 1st, *539 1893, No. 91 was due August 1st, 1893, and No. 92 was due September 1st, 1893. Under the rules of the order said assessments No. 90, No. 91 and No. 92, were required to be paid by said McMahon within thirty days from the respective dates aforesaid, and in case of non-payment he stood suspended from all rights and benefits of membership, and your verdict should be for the defendant, if you find that he failed to pay assessment No. 92 on or before September 30th, 1893, unless you find that the defendant has waived a compliance with its rules respecting the time within which assessments were payable as set forth in instruction No. 6 following.
To the giving of which instructions the defendant, by its counsel, then and there excepted at the time.
At the request of defendant the court gave the following:
5. The court instructs the jury that the mere fact that the finance keeper of Adasa Tent had received any prior assessment from the deceased after the time when, under defendant’s laws it was due, or after the deceased stood suspended without a physician’s certificate of good health, if you find the finance keeper did so receive any assessment, did not bind the defendant to a course of conduct or practice or custom so as to make it cumpulsory on the finance keeper of Adasa Tent or defendant to receive assessment No. 92 without a physician’s certificate of good health at the time it was mailed to said finance keeper. r
Arid at the same time defendant asked the following, which the court refused, and defendant excepted:
“B. The court instructs the jury that if they believe and find from the evidence that John C. McMahon, plaintiff’s husband, failed to pay assessment No. 92 during the month of September, 1893, he stood suspended, under defendant’s laws, from all the benefits of the order, and that the officers of Adasa Tent No. 6 had no authority under the laws of the defendant after the 10th day of October, 1893, to receive said assessment unless it was accompanied by a physician’s certifi *540 cate showing said McMahon to be in good health, and the mere fact that E. W. Stevens, deputy supreme commander, knew that some prior assessment had been received by the tent finance keeper while the deceased stood suspended, did not constitute a waiver on the part of defendant of prompt and foil compliance with defendant’s law.
“0. It appears from the undisputed evidence in this case that McMahon joined the order June 2d, 1893, and paid his advance assessment; that the laws, required .a further assessment the first day of each month; which would require another assessment July 1st, another August 1st, another assessment September 1st, and another assessment October 1st, and so on, in each of which assessments, except the first or advance assessment, thirty days were allowed for payment, after which the members stood suspended. In this case McMahon paid his advance assessment June 2d; he also paid the July and August assessments, but the assessment due September 1st not being paid, he would stand suspended October 1st, and tender of this assessment to the finance keeper after the death of McMahon would not avoid the suspension or renew his membership, and your verdict must be for the defendant.
“D. The court instructs the jury that under the laws of the Supreme Tent, which formed a part of the contract of membership of the deceased in defendant’s order, Adasa Tent No. 6 was, through its officers, the agent of the deceased for the receipt and transmission of his assessments to the Supreme Tent, and that the receipt by any officer of said Adasa Tent of any assessment from said McMahon while he was suspended or in arrears, if you believe any such assessments were so received, is not binding on the Supreme Tent.”
There was a verdict and judgment for plaintiff for $3,313, from which, after due course, the defendant has taken this appeal.
I. That the plaintiff’s husband was delinquent on the September assessment by the strict rule of the order is undis *541 puted, and if the strict compliance with those laws in that respect was not waived by the defendant, the plaintiff can not recover, and on the other hand, if strict compliance was waived, she is not precluded on that account.
A fraternal society doing a limited life insurance business as the law permits may waive the provisions of its own law in regard to forfeiture of the insurance on account of failure to pay premiums within the strict requirement. “The general rules of waiver of forfeiture are the same in association insurance as in ordinary insurance.” [Hirschl on Frat. Societies, p. 34 ; Bacon on Ben. Soc., sec. 434 ; Harvey v. Grand Lodge, 50 Mo. App. 472 ; Chadwick v. Triple Alliance, 56 Mo. App. 463 ; Grand Lodge v. Reneau, 75 Mo. App. 402.]
A member of such society is presumed to know its laws, and the contract of insurance is to be construed as having been made under the limitations of those laws. But a member has a right to look to the general conduct of the society itself, in respect of the observance of its laws, particularly those relating to his own duties, and if the society by its conduct has induced him to fall into a habit of non-observance of some of its requirements it can not without warning to him of a change of purpose, inflict the penalty of failure of strict observance. A member dealing with a subordinate officer of the society, knowing his duties to be prescribed by law, has no right to rely upon the act of that officer, if he should attempt to waive .a requirement which under the law he has no right to waive. But when he has dealings of that kind with such officer and those dealings are of such a nature that they must pass under the observation of those who have in charge the ultimate management of the company’s affairs to such an extent as to justly induce the member to believe that the practice is approved by the company itself, the company is estopped to take advantage of the situation.
It is essential to the life of these societies, that the members pay the assessments promptly, as their laws require. As *542 a general rule it is cheap insurance, its cost is calculated at the lowest rate at which it can be carried, and if the society is lax and its officers carry the sentimental feature of its organization too far into its business management, it is liable to fail of its beneficien! purpose. But the duty of guarding against such misfortune is primarily on the officers who are entrusted with its management at the head, and if they permit lax dealing of their subordiante officers to the degree of misleading a member, the responsibility must rest upon the society. These principles of law are amply illustrated in the authorities cited in the briefs of counsel, but they are so manifest that citation of authority to support them is unnecessary.
Now what are the facts of this case calling for the application of those principles ?
Plaintiff’s husband became a member in June, 1898, and paid one assessment, No. 89, which carried him without reproach to July 1st. On that day another assessment was due of which the members had thirty days to make payment. On July 31st that assessment not having been paid, plaintiff’s husband, stridissimi juris, stood suspended; and if the law in that respect had been observed, within two days thereafter the record keeper would have informed the supreme record keeper, and the commander of the local tent in open tent, and on the 1st of August the keeper of finance and record keeper of the tent would have forwarded to the supreme record keeper their monthly report, together with the amount collected of the July assessment, showing all those who were suspended for non-payment of the same, and after that it was the duty of the record beeper of the tent to notify the plaintiff’s husband that he was in arrears. But instead of complying with the law, the record keeper and the finance keeper made no report until August 80th, and plaintiff’s husband having in the meantime, on August 24th, paid the July assessment, no indication of his suspension was given, no report of it was made to the supreme record keeper, nor to the commander in open tent, and no other *543 notice had been given the member that he was in arrears. The only communication sent him in reference to the July assessment was the letter of Mr. Stevens, whether within his capacity as deputy supreme commander or that of record keeper does not appear, dated September 22, 1893, in which the writer misinforms the member that that assessment would become due August 10th. This was misinformation to this extent: the last day on which the payment could be made without incurring the penalty of suspension was July 31st, but after being suspended he had ten days in which without action of the tent, he could pay the assessment and tent dues and become reinstated. But of notice that he was in arrears he had none. The payment of No. 90 on Aug. 24th, was to the finance keeper in the presence of Mr. Stevens, deputy supreme commander and record keeper of the tent, and no physician’s certificate was demanded or given. The conduct of these oificers in reference to the August assessment No. 91 was the same except that on September 20th, the finance keeper wrote the plaintiff’s husband that he must pay the assessment before September 25th, otherwise he would be suspended. This was again misinformation leading him to believe that he had until the date named without condition in which to make the payment, whereas by law he was in default August 31st, and stood suspended, if the law had been enforced. The date of the payment of the August assessment is not given, but the letter would indicate that it was between the 20th, the date of the letter, and the 2Yth of September, the date on which the report was forwarded to the supreme record keeper. And so of the September assessment. The first of October came, plaintiff’s husband was in default, but no action was taken to enforce the law in reference to suspensions, if any action was necessary, or to place the fact of record as the law required, and the report that should have gone in to the. supreme record keeper on October 1st, was, like those preceding it, withheld. On October 26th plaintiff’s husband bought a postoifice order *544 for the amount of the September assessment, and inclosed it in a letter to the finance keeper duly mailed to his address, and it was received by him in due course of mail. The two letters that he had received, one from the record keeper in relation to the July assessment, and the other from the finance keeper in relation to the August assessment, indicated that amounts respectively named should be remitted by mail. There can be no doubt from their former course of business, but that this last payment would have been retained and the plaintiff’s husband carried on the rolls as a member in good standing if nothing had happened to make it to the interest of the defendant to act otherwise. But on the same day, after he had mailed the letter containing the postoffice money order, the plaintiff’s husband was accidentally killed, and that fact coming to the knowledge of the tent officers, they took legal advice and inclosed the money order in a letter by mail addressed to his widow the plaintiff, but she refused to accept it. Although the plaintiff’s husband was chargeable with knowledge of the law of the society, yet he also knew that during the period at least of his connection with the order, those laws were never enforced, and the practice, the unvaried practice so far as he was concerned, was not to enforce the law as written, and the circumstances show that he acted in accordance with that practice.
Now if this practice was limited to the member and officers of the subordinate lodge with whom he had the dealings, and no knowledge of it or acquiesence in it, by the Supreme Lodge, the latter would not be estopped by it. Did the practice in this case go any farther than the subordinate lodge? It was certainly known and participated in by the deputy supreme commander for that State, because he was at the same time record keeper of the tent whose duty it was to make the reports, and who as we have seen withheld them, contrary to law, until it suited him to forward them. The supreme commander was the chief officer of the society, and it *545 was expressly provided that his duties were “to enforce all laws thereof,” and “députy supreme commanders are the representatives of the supreme commander in' the territory under their jurisdiction,” and they are required to give bond for the faithful performance of their duties. Knowledge of the deputy supreme commander was knowledge of the supreme commander himself.
The officer next in importance was the supreme record keeper. He said in his deposition that he knew by hearsay that the officers of subordinate tents were in the habit of indulging their members beyond the time limited by law for making their payments, but he had no personal knowledge of it. He only knew the actions of the subordinate tents and their officers by their monthly reports. He knew how many members there were in a tent, and when a report came if it covered the amount due for that number of members he was satisfied, if not he investigated. H there was any indulgence of a member in this tent the witness knew nothing of it. Yet he said he knew that the reports covering assessments Nos. 90, 91 and 92, which were due the first days of August, September, and October, did not reach him until a month after they were respectively due. Why did he let them go so long? The law required the money to be collected and in the hands of the Officers of the subordinate tent on the last day of the month for which it was called, on that day the delinquents were to be suspended, and on the next day the report and remittance should be forwarded. He either knew what was going on, or willfully shut his eyes to it.
In point of fact, so far as the record of this defendant’s membership is concerned, both in the supreme tent and the subordinate tent the plaintiff’s husband stood on the books as a member in good standing. The first entry on any record against him was made after he was dead.
It is contended by counsel for defendant that one or two instances are not sufficient to constitute a course of dealing which would amount to an estoppel or a waiver.
*546 The Supreme Court of the United States approved an instruction to the jury in which this was said by the trial judge: “Of course we speak by our actions, just as much as we do .by our words; and although there may be no spoken word, no written word, declaring a waiver, yet it may be that a man by his conduct, his course of dealing, justly and fairly leads the other party to believe that he does not care about a strict compliance. That is what this plaintiff says was the case here; that while the contract reads ‘payment must be made on specified days/ yet the company did not insist on such payment. It did, when her husband was alive and well, take the dues from him after the time specified and permit the policy to continue in force, and that it did so until he had a right, as a reasonable man, to believe, and did in fact believe, that that was to be the rule in the future. I do not think that any particular number of instances, one or more, can be said as a matter of law to make or not make a waiver. It is a question for you, as reasonable men, to consider what did the company intend; what would its conduct make a reasonable man believe in reference to it.” [Hartford Life Ins. Co. v. Unsell, 114 U. S. loc. cit. 448.] In that same case that court quotes from one of its former decisions: “We have recently in the case of Ins. Co. v. Norton, 96 U. S. 234, shown that forfeitures are not favored in layr; and that courts aie always prompt to seize hold of any circumstances that indicate an intention to waive a forfeiture.”
This is no new doctrine in this State. [Hanley v. Life Ass’n, 69 Mo. 380 ; Froehlich v. Atlas Ins. Co., 47 Mo. 406.]
Under the circumstances of this case there was ample justification for submitting the question of waiver to the jury, and the evidence well sustains the. verdict.
II. The laws of the order declare the subordinate tent and the officers thereof to be the agents of the members in his dealings with the Supreme Tent. But there is no merit in the proposition. The law will determine whose agent one is, not *547 from the mere declaration, that he is the agent of the one or the other, bnt from the source of his appointment and the nature of the duties he is appointed to perform. [Schunck v. Gegenseitiger Fond, 44 Wis. 369.]
III. The second instruction given is criticised by the learned counsel for defendant because it contains the expression as to the proof “to the satisfaction of the jury.” We see nothing objectionable in that expression. In the case cited in support of the objection the Kansas City Court of Appeals cautioned the trial court in remanding the case, that it would be better on the retrial not to use the expression “to the full satisfaction of the jury” and “clear preponderance of the testimony.” It was the adjectives that the court objected to, but the case was not reversed on that ground. [Scott v. Allenbaugh, 50 Mo. App. 130.] The instruction is also criticized for the use of the expression “when due” in reference to the assessments, without taking into consideration the thirty and ten days of grace. It is impossible under the evidence that the jury could have been misled by, or have misunderstood that expression. The time when due as used all through the trial included the days of grace. It is also insisted that the instruction was erroneous in submitting the question of waiver to the jury at all, because the acts mentioned were indulgences to the member by his own agent. We have already discussed that proposition ? The learned counsel also thinks there is a conflict between instructions 2 and 5. In the one the jury are 'told that if they find certain facts they may infer a waiver, in the other they are told that the mere receiving of one assessment out of time would not bind the defendant to continue to do so. The theories advanced in instructions B, C and D are discussed at length above, and being in conflict with the views herein expressed, they were properly refused.
IY. The last proposition of defendant is that the laws of the order made the board of trustees and the Supreme Tent *548 the tribunals to hear and determine this controversy and no suit at law will lie.
This point is argued on behalf of defendant as if the laws of the society taken as a part of the contract constitute an agreement to submit the controversy that might arise out of it to arbitration. But the by-laws taken as a part of the contract do not have any of the elements of an agreement for arbitration; they purport merely to make the defendant the judge in its own case to determine the whole controversy between it >and the plaintiff. That such an agreement is invalid requires no argument.
A society like the defendant has a dual character, social and business. Courts will not entertain a suit to enforce mere social rights of a member in such a society, but his rights as a policy holder are as much under the protection of the law as any property right. A member’s interests in these two sides of the society may to a great degree depend on each other. If one’s right, under the laws of the society, to hold a benefit certificate depends on his maintaining his standing as a social-member, and if he. should be expelled by the society for a violation of its rules governing its social conduct, a question might be presented as to whether or not the judgment of the society was final and conclusive of his right as a policy holder. But no such question is in this case. The only questions that are involved here, are those relating to the rights of the parties growing out of the business side of the defendant’s organization. As to those questions the defendant can not bind its members to submit to its judgment.
We find no error in the record, and the judgment of the circuit court is affirmed.
All concur.