ALICE SEAGO, Administratrix of the Estate of WILLIAM E. SEAGO, Appellant, v. THE NEW YORK CENTRAL RAILROAD COMPANY.—155 S. W. (2d) 126.*

Division One, June 12, 1941.

Rehearing Denied, July 25, 1941.

Motion to Transfer to Banc Overruled, October 30, 1941.

*Mark D. Eagleton* and *Wm. H. Allen* for appellant.

*Reversed. 86 L. Ed. 518.

764

*Wilton D. Chapman* for respondent.

BRADLEY, C.—William E. Seago was a New York Central conductor and while on duty about 7:30 P. M. (after dark), January 17, 1938, was run over and killed by his train in the Wann yards, East Alton, Illinois. As administratrix of the estate of deceased, plaintiff, his widow, brought this suit under the Federal Employers' Liability Act, 45 U. S. C. A., secs. 51-59, to recover $65,000 damages for the alleged wrongful death of her husband. Verdict and judgment went for defendant. Motion for new trial was overruled and plaintiff appealed, and assigns error on defendant's instructions 4 and 6.

It was admitted that the cause was properly under the Federal Employers' Liability Act. Plaintiff alleged several grounds of negligence. The answer was a general denial. The cause was submitted on the alleged violation of a rule and custom "that an engine and train should not be started and moved until a proper hand lantern signal was given by a member of the switching crew for such start and movement."

The train crew consisted of the deceased conductor, and Emery M. Lucier, engineer, Clarence Wenzel, fireman, and Louis Michel and C. H. Laughlin, brakemen.

The tracks in the yards extended generally north and south. The lead track led off, at north end of yards, from the east side of the main track and curved to the east like, and then extended south. Beginning at the north end of the lead track, switch tracks 1 to 8 inclusive, led off from the west side of the lead track. There were eight switch stands, all on the east side of the lead track, by which stands the eight switch tracks were controlled. This arrangement placed switch track No. 8 next to the lead track, while No. 1 was next to the main track on the west.

The train involved was composed of the engine, tank, and about twenty cars. The engine backed north on switch track No. 8, pulling the twenty cars in front of it and the intention was to go upon the lead track where switch track No. 8 led off from the lead track. The engineer and fireman were each in his proper place, the engineer on the right (west) side of the backing engine and the fireman on the left (east) side. While the train was backing north on switch track No. 8, the brakemen were in the engine cab until near switch stand No. 8; deceased was on the pilot "between the box car and the

engine." There was an Alton train (C. & A.) on the lead track near switch No. 8, and deceased's train stopped a short distance south of switch No. 8 for the Alton train to clear. There was a headlight on the rear of the tank, but when the engine stopped the headlight was turned off. When the engine stopped near switch No. 8, the brakemen got off and went forward to line the switches so the train could continue backing north on the lead track after it came on that track from switch track No. 8. From the stop near switch No. 8, and after the headlight was turned on, the train started up and moved slowly, and while so moving deceased got on the iron step or stirrup at the northwest corner of the tank. The train, after entering the lead track, backed north, but on account of the Alton train, stopped again at or near switch No. 4, and deceased got down from the step and walked a few feet forward. The engineer, defendant's witness, testified that while stopped, at or near switch No. 4, he got a signal from brakemen Laughlin, for the backup movement that resulted in Seago's death. And the engineer said that he also got a backup signal from Seago for this movement.

Laughlin, a witness for defendant, testified that he was up at switch No. 2; that he lined No. 2 (the switch stand was east of lead track); that he then, in order to get on the engineer's side of the track, walked over to the west side of the lead track and gave a backup signal with his lantern; that when he gave the backup signal, the engineer turned on the bell and the headlight and started backing up; that the engine backed up "in the neighborhood of fifteen feet" before it stopped. Laughlin said that when he gave the backup signal he did not know whether he was then visible to the fireman.

The engineer testified further that at the time he got the backup signal from Laughlin and deceased, that he, deceased, was "about two or three feet ahead of the tank. ▮▮▮ . . . When he got down from the side of the tank he walked north. The last time I saw him do anything was when he gave me a signal . . . I had my eyes on him from the time he got off the side of that tank until he walked north three or four feet. When he was walking he was off to one side a little bit, and he stepped over a little to the right of me, just a little bit. The last time I saw him his body was in such a position that it was three or four feet north of the west side of my engine, which would be the right side and immediately in front of that. From the darkness that prevailed, I could not tell whether he was facing me or whether his back was turned toward me. Nor could I tell at that time whether he was standing still or walking. He had been standing still there for quite a bit, waiting for that train (Alton) to come in. At the time he gave that backup signal, which caused the engine to move north a short distance, I could not tell whether he was moving or standing still. I was watching the man ahead of me for a signal, and when he gave it Seago also gave one too." The

engineer said that from the startup his engine moved "one or two miles an hour," and that, when he had moved eight or ten feet, "all at once the air was set on me."

Defendant's witness, brakeman Michel, at the time the train started up on this occasion, was a short distance north of it. He testified: "When I turned and looked at Mr. Seago he was in the act of falling; falling from the west to the east, in front of the engine (rear of tank). At that time I judge I was about twenty feet from him. He appeared to me like he was higher than the ground because his lamp was up high in the air, and when I seen him he was falling; the lantern was going down; his left hand was going down. . . . After seeing Mr. Seago falling, I stopped the train. I jumped in front of it and pulled the angle cock. That throws the train into emergency. The engine was in motion at the time and wasn't going over a mile an hour, to the best of my knowledge. I seen Seago's light go up in the air and he was falling, on his way down. . . . When I looked at him, at that very second he was in the act of falling. He was falling this way, and his face toward the engine. The side of his body was going toward the southeast." Michel said that he saw "this other man," meaning Laughlin, as we understand, give the backup signal; saw the light go on; heard the air of the engine released, which meant that the engine was starting up. But Michel said that he did not remember which side of the lead track that Laughlin was on when he, Laughlin, gave the backup signal. Plaintiff took Michel's deposition and in the deposition he said that Laughlin was on the east side of the lead track when he, Laughlin, gave the backup signal.

C. F. Sunderland, a witness for defendant, was, at the time Seago was killed, in the Wann yards, as a member of a switching crew of the Alton railroad. Sunderland was standing in the doorway of a shanty office in the yards. "Q. Tell us what you saw happen. A. Michel was standing talking to me and I glanced up and saw Seago's lantern go up in the air. Q. Now, where was Seago when you saw him? A. He was on the back footboard of the engine (rear of tank). . . . Q. Now, he was standing on that footboard. Now, what did you see happen then? A. After his light went up in the air he fell. Q. And what happened then? A. I hollered at Michel that Eddie was under the engine. Q. And what took place then? A. Michel ran from where he was talking to me, across in front of the engine (rear of tank) and opened the angle cock on the engine. Q. What does that do? What happened then? A. That set the air on the entire train, and it stopped immediately. . . . Q. Was the engine backing up when you saw Seago standing on the footboard? A. Yes, sir."

On cross-examination Sunderland testified: "Q. But you hadn't seen Seago at any time until you laid your eyes on him just prior

to the time you spoke to Michel; isn't that right? A. I saw him when he got on the footboard. . . . Q. You saw Mr. Seago, you say, get on the footboard? A. Yes, sir. Q. Then awhile ago when I asked you the question when you laid your eyes on him for the first time he was in the act of falling; was he in the act of falling? A. No, sir.''

Fireman Wenzel, as a witness for plaintiff, testified that when the engine stopped ▮▮▮▮ at or near switch No. 4, he was at his proper place in the cab, on the east side; that he sat there and watched until after the engine started up, but ''did not see any signals passed on my side at any time;'' that the engine stopped about 150 feet from switch No. 2; that he could have seen any signals that were made on his side; that he did not remember hearing any bell sounded before the engine started up. ''Q. Is there a place where you can't see the signals passed on the other—on the opposite side there? A. Yes, sir, the tank obstructs the view. Q. Did you make any observations or look to see how far ahead your view is obstructed by the end of the tank out there, at any time? A. Yes, sir. Q. I will ask you about that. A. Between 200 and 250 feet before you can see the rail behind the tank of the engine on the engineer's side. That would be the west side, where we were then.''

Plaintiff took Wenzel's deposition, and when giving the deposition he answered ''yes'' to this question, ''And you could see whether signals were passed at the west side of the lead and to the east side, you could see them?'' When he read the deposition after it was transcribed and before signing it, he added to the answer ''yes,'' the words ''east side only,'' so that the answer, after the change, was ''yes, east side only.''

Plaintiff's witness, H. E. Rosher, was field representative of the Brotherhood of Railroad Trainmen and ''was called upon by them to investigate this accident.'' He testified that the distance between the switch stands on the east side of the lead track was between seventy and seventy-five feet; that after an engine coming onto the lead track from switch track No. 8 has reached switch No. 7, the lead track from there on north ''is straight and the view from the firemen's side is unobstructed.'' ''Q. Now, when the engine stops at that point and the switchmen go ahead to line up these switches, from what place must the signals be passed in order to give proper signals to that engine crew in the night time? A. The switches (switch stands) being on the east side of this lead, the signal naturally would be given on the side that the switches are at.''

Instruction No. 4 told the jury to find for defendant ''unless plaintiff has proven to your satisfaction by a preponderance or greater weight of the evidence'' that the proper hand lantern signal was not given. It is contended that the phrase *to your satisfaction* placed a greater burden on plaintiff than required by the law. Instruction

No. 6 told the jury to find for defendant if they found that Seago "came to his death at the time and place mentioned in the evidence, not as the result of any negligence on the part of the defendant, as that term is used in these instructions, but as the sole direct and proximate result of his own act in stepping on or riding on the footboard of the tank of the engine, if you find and believe from the evidence he did so, or attempted to do so." It is contended that there was no evidence to support Instruction No. 6.

█ As we view the record it will not be necessary to rule the assignments based on instructions 4 and 6, and this for the reason there was no substantial evidence to support submission on the hypothesis that a proper hand lantern signal was not given for the backup movement which resulted in Seago's death. Defendant asked a peremptory direction to find for it at the close of the case, but such was refused. Plaintiff says, however, that defendant has waived the right to complain of such refusal because such point is not mentioned in its "points and authorities." It is true that defendant does not mention, in its points and authorities, what we may term the demurrer to the evidence, but such is considered in the "conclusion" paragraphs of defendant's written argument. As supporting the waiver claim plaintiff cites Burch v. Cleveland, C., C., & St. L. Ry. Co., 328 Mo. 59, 40 S. W. (2d) 688, l. c. 693. The waiver in that case pertained to *procedural* matters "not presented under head of points and authorities" by *appellant* and not applicable here.

█ The engineer and the two brakemen testified that a proper backup signal was given. The fireman said that he did not see any backup signal "on my side at any time."

Measured by the demurrer plaintiff was entitled to any reasonable inference to be drawn from the evidence. It is settled law that a "'court should never withdraw a question from the jury, unless "all reasonable men, in the honest exercise of a fair, impartial judgment, would draw the same conclusion from the facts which condition the issue."' . . . Where there is uncertainty arising 'from a conflict in the testimony or because, the facts being undisputed, fairminded men will honestly █ draw different conclusions from them, the question is not one of law but of fact to be settled by the jury.'" [Parrent v. Mobile & Ohio R. Co., 334 Mo. 1202, 70 S. W. (2d) 1068, l. c. 1073; Courtney v. Ocean Accident & Guaranty Corp., 346 Mo. 703, 142 S. W. (2d) 858, l. c. 860.] However, a demurrer to the evidence does not admit "forced and violent inferences," Lappin v. Prebe et al., 345 Mo. 68, 131 S. W. (2d) 511, l. c. 513; Darby v. Henwood et al., 346 Mo. 1204, 145 S. W. (2d) 376, l. c. 380, and "an instruction must be sustained by the evidence and may not invite a verdict based on conjecture and speculation." [State ex rel. Banks v. Hostetter et al., 344 Mo. 155, 125 S. W. (2d) 835, l. c. 838; Gately v. St. Louis-S. F. Ry. Co., 332 Mo. 1, 56 S. W. (2d) 54, l. c. 62.]

In the present case, submission on the theory·that no hand lantern backup signal was given, would, we think, "invite a verdict based on conjecture or speculation."

Since plaintiff failed to make a submissible case, errors, if any, in the instructions need not be considered. [Bella v. Stuever (Mo.), 44 S. W. (2d) 619, 1. c. 620, and cases there cited.]

The judgment should be affirmed and it is so ordered. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.