ALICE SEAGO, Administratrix of the Estate of WILLIAM E. SEAGO, Appellant, v. NEW YORK CENTRAL RAILROAD COMPANY.—164 S. W. (2d) 336.

Division One, July 28, 1942.

Rehearing Denied, September 8, 1942.

*Eagleton, Waechter, Elam & Clark* for appellant.

*Samuel W. Baxter, Charles P. Stewart* and *Wilton D. Chapman* for respondent.

BRADLEY, C.—This is an action under the Federal Employers' Liability Act to recover for the death of plaintiff's husband, a conductor, who was run over and killed in defendant's yards in East Alton, Illinois. The verdict was for defendant and plaintiff appealed. We heretofore ruled that plaintiff, under the facts, failed to make a submissible case and affirmed the judgment below. [Seago v. New York Central R. Co., 348 Mo. 761, 155 S. W. (2d) 126.] The Supreme Court of the United States granted certiorari and in a memorandum opinion reversed the judgment of this court "on the ground that there was sufficient evidence of negligence for submission to the jury," and remanded the cause to this court "for

1250

further proceeding." [Seago v. New York Central R. Co., 62 S. Ct., 806.]

For convenience of the reader we here repeat our former statement [155 S. W. (2d) 126]: "William E. Seago was a New York Central conductor and while on duty about 7:30 P. M. (after dark), January 17, 1938, was run over and killed by his train in the Wann yards, East Alton, Illinois. As administratrix of the estate of deceased, plaintiff, his widow, brought this suit under the Federal Employers' Liability Act, 45 U. S. C. A., secs. 51-59, to recover $65,000 damages for the alleged wrongful death of her husband. Verdict and judgment went for defendant. Motion for new trial was overruled and plaintiff appealed, and assigns error on defendant's instructions 4 and 6.

"It was admitted that the cause was properly under the Federal Employers' Liability Act. Plaintiff alleged several grounds of negligence. The answer was a general denial. The cause was submitted on the alleged violation of a rule and custom 'that an engine and train should not be started and moved until a proper hand lantern signal was given by a member of the switching crew for such start and movement.'

"The train crew consisted of the deceased conductor, and Emery M. Lucier, engineer, Clarence Wenzel, fireman, and Louis Michel and C. H. Laughlin, brakemen.

"The tracks in the yards extended generally north and south. The lead track led off, at north end of yards, from the east side of the main track and curved to the east like, and then extended south. Begining at the north end of the lead track, switch tracks 1 to 8, inclusive, led off from the west side of the lead track. There were 8 switch stands, all on the east side of the lead track, by which stands the 8 switch tracks were controlled. This arrangement placed switch track No. 8 next to the lead track, while No. 1 was next to the main track on the west.

"The train involved was composed of the engine, tank, and about 20 cars. The engine backed north on switch track No. 8, pulling the 20 cars in front of it, and the intention was to go upon the lead track where switch track No. 8 led off from the lead track. The engineer and fireman were each in his proper place, the engineer on the right (west) side of the backing engine and the fireman on the left (east) side. While the train was backing north on switch track No. 8, the brakemen were in the engine cab until near switch stand No. 8; deceased was on the pilot 'between the box car and the engine.' There was an Alton train (C. & A.) on the lead track near switch No. 8, and deceased's train stopped a short distance south of switch No. 8 for the Alton train to clear. There was a head light on the rear of the tank, but when the engine stopped the head light was turned off. When the engine stopped near switch No. 8, the brakemen got off and went forward to line the switches so the train could con-

tinue backing north on the lead track after it came on that track from switch track No. 8. From the stop near switch No. 8, and after the head light was turned on, the train started up and moved slowly, and while so moving deceased got on the iron step or stirrup at the northwest corner of the tank. The train, after entering the lead track, backed north, but on account of the Alton train, stopped again at or near switch No. 4, and deceased got down from the step and walked a few feet forward. The engineer, defendant's witness, testified that while stopped, at or near switch No. 4, he got a signal from the brakeman Laughlin, for the backup movement that resulted in Seago's death. And the engineer said that he also got a backup signal from Seago for this movement.

"Laughlin, a witness for defendant, testified that he was up at switch No. 2; that he lined No. 2 (the switch stand was east of lead track); that he then, in order to get on the engineer's side of the track, walked over to the west side of the lead track and gave a backup signal with his lantern; that when he gave the backup signal, the engineer turned on the bell and the head light and started backing up; that the engine backed up 'in the neighborhood of fifteen feet' before it stopped. Laughlin said that when he gave the backup signal he did not know whether he was then visible to the fireman.

"The engineer testified further that at the time he got the backup signal from Laughlin and deceased, that he, deceased, was 'about two or three feet ahead of the tank. . . . When he got down from the side of the tank he walked north. The last time I saw him do anything was when he gave me a signal. . . . I had my eyes on him from the time he got off the side of that tank until he walked north three or four feet. When he was walking he was off to one side a little bit, and he stepped over a little to the right of me, just a little bit. The last time I saw him his body was in such a position that it was three or four feet north of the west side of my engine, which would be the right side and immediately in front of that. From the darkness that prevailed, I could not tell whether he was facing me or whether his back was turned toward me. Nor could I tell at that time whether he was standing still or walking. He had been standing still there for quite a bit, waiting for that train (Alton) to come in. At the time he gave that backup signal, which caused the engine to move north a short distance, I could not tell whether he was moving or standing still. I was watching the man ahead of me for a signal, and when he gave it Seago also gave one too.' The engineer said that from the startup his engine moved 'one or two miles an hour,' and that, when he had moved 8 or 10 feet, 'all at once the air was set on me.'

"Defendant's witness, brakeman Michel, at the time the train started up on this occasion, was a short distance north of it. He testified: 'When I turned and looked at Mr. Seago he was in the act

of falling; falling from the west to the east, in front of the engine (rear of tank). At that time I judge I was about twenty feet from him. He appeared to me like he was higher than the ground because his lamp was up high in the air, and when I seen him he was falling; the lantern was going down; his left hand was going down. . . . After seeing Mr. Seago falling, I stopped the train. I jumped in front of it and pulled the angle cock. That throws the train into emergency. The engine was in motion at the time and wasn't going over a mile an hour, to the best of my knowledge. I seen Seago's light go up in the air and he was falling, on his way down. . . . When I looked at him, at that very second he was in the act of falling. He was falling this way, and his face toward the engine. The side of his body was going toward the southeast.' Michel said that he saw 'this other man,' meaning Laughlin, as we understand, give the backup signal; saw the light go on; heard the air of the engine release, which meant that the engine was starting up. But Michel said that he did not remember which side of the lead track that Laughlin was on when he, Laughlin, gave the backup signal. Plaintiff took Michel's deposition and in the deposition he said that Laughlin was on the east side of the lead track when he, Laughlin, gave the backup signal.

"C. F. Sunderland, a witness for defendant, was, at the time Seago was killed, in the Wann yards, as a member of a switching crew of the Alton railroad. Sunderland was standing in the doorway of a shanty office in the yards.

" 'Q. Tell us what you saw happen. A. Michel was standing talking to me and I glanced up and saw Seago's lantern go up in the air. Q. Now, where was Seago when you saw him? A. He was on the back footboard of the engine (rear of tank). . . . Q. Now, he was standing on that footboard. Now, what did you see happen then? A. After his light went up in the air he fell. Q. And what happened then? A. I hollered at Michel that Eddie was under the engine. Q. And what took place then? A. Michel ran from where he was talking to me across in front of the engine (rear of tank) and opened the angle cock on the engine. Q. What does that do? What happened then? A. That set the air on the entire train, and it stopped immediately. . . . Q. Was the engine backing up when you saw Seago standing on the footboard? A. Yes, sir.'

"On cross-examination Sunderland testified: 'Q. But you hadn't seen Seago at any time until you laid your eyes on him just prior to the time you spoke to Michel; isn't that right? A. I saw him when he got on the footboard. . . . Q. You saw Mr. Seago, you say, get on the footboard? A. Yes, sir. Q. Then awhile ago when I asked you the question when you laid your eyes on him for the first time he was in the act of falling; was he in the act of falling? A. No, sir.'

"Fireman Wenzel, as a witness for plaintiff, testified that when the engine stopped at or near switch No. 4, he was at his proper place in the cab, on the east side; that he sat there and watched until after the engine started up, but 'did not see any signals passed on my side at any time;' that the engine stopped about 150 feet from switch No. 2; that he could have seen any signals that were made on his side; that he did not remember hearing any bell sounded before the engine started up. 'Q. Is there a place where you can't see the signals passed on the other—on the opposite side there? A. Yes, sir, the tank obstructs the view. Q. Did you make any observations or look to see how far ahead your view is obstructed by the end of the tank out there, at any time? A. Yes, sir. Q. I will ask you about that. A. Between 200 and 250 feet before you can see the rail behind the tank of the engine on the engineer's side. That would be the west side, where we were then.'

"Plaintiff took Wenzel's deposition, and when giving the deposition he answered 'yes' to this question, 'And you could see whether signals were passed at the west side of the lead and to the east side, you could see them?' When he read the deposition after it was transcribed and before signing it, he added to the answer 'yes,' the words 'east side only,' so that the answer, after the change, was 'yes, east side only.'

"Plaintiff's witness, H. E. Rosher, was field representative of the Brotherhood of Railroad Trainmen and 'was called upon by them to investigate this accident.' He testified that the distance between the switch stands on the east side of the lead track was between 70 and 75 feet; that after an engine coming onto the lead track from switch track No. 8 has reached switch No. 7, the lead track from there on north 'is straight and the view from the fireman's side is unobstructed.' 'Q. Now, when the engine stops at that point and the switchmen go ahead to line up these switches, from what place must the signals be passed in order to give proper signals to that engine crew in the night time? A. The switches (switch stands) being on the east side of this lead, the signal naturally would be given on the side that the switches are at.' "

In our prior opinion we held, under the facts, that "submission on the theory that no hand lantern signal was given" would "invite a verdict based on conjecture or speculation." However, in causes arising under the Federal Employers' Liability Act we are bound by rulings of the Supreme Court of the United States. Arnold v. Scandrett et al., 345 Mo. 115, 131 S. W. (2d) 542, hence we pass to plaintiff's assignments on defendant's instructions 4 and 6, and we shall consider these in the inverse order.

Instruction 6 follows: "You are instructed that if you find and believe from the evidence in this case that said William E. Seago came to his death at the time and place mentioned in the evidence,

not as the result of any negligence on the part of the defendant, as that term is used in these instructions, but as the sole direct and proximate result of his own act in stepping on or riding on the footboard of the tank of the engine, if you find and believe from the evidence he did so, *or attempted to do so,* then plaintiff cannot recover in this case and your verdict must be for the defendant" (italics ours).

Plaintiff challenges Instruction 6 on four grounds, viz.: (1) That it is not a proper sole cause instruction in that it does not advise the jury that contributory negligence alone would not prevent recovery; (2) that there was no substantial evidence to support the instruction, and that it invited the jury into the field of speculation and conjecture; (3) that it assumes controverted facts; and (4) that it is an unwarranted comment on the evidence.

█ As supporting the first ground of complaint on Instruction 6, plaintiff cites Dilallo v. Lynch et ux., 340 Mo. 82, 101 S. W. (2d) 7; Kirkham v. Jenkins Music Co. et al., 340 Mo. 911, 104 S. W. (2d) 234; Peppers v. St. Louis-San Francisco Ry. Co., 316 Mo. 1104, 295 S. W. 757. Since the appeal in the present case, the Dillalo case and other similar cases, on the point, have been disapproved. [Stanich v. Western Union Tel. Co., 348 Mo. 188, 153 S. W. (2d) 54, l. c. 59.]

The Stanich case holds that such direction or advice as plaintiff says was omitted from defendant's Instruction 6 "should not be made an essential requirement of a defendant's instruction which sufficiently hypothesizes a sole cause act," but that such direction or advice should be left to plaintiff █ to instruct upon if desired. [See also Mendenhall v. Neyer et al., 347 Mo. 881, 149 S. W. (2d) 366, l. c. 372; Long v. Mild et al., 347 Mo. 1002, 149 S. W. (2d) 853, l. c. 860; Shields v. Keller, 348 Mo. 326, 153 S. W. (2d) 60, l. c. 64; Hopkins v. Highland Dairy Farms Co. et al., 348 Mo. 1158, 159 S. W. (2d) 254, l. c. 257.]

█ Was there substantial evidence to support Instruction 6? It will be noted that Sunderland, on direct examination, testified that he was standing in the shanty office doorway, and "glanced up and saw Seago's lantern go up in the air;" that after the engine started up and just prior to the casualty, he saw Seago standing "on the back footboard," and that the engine was backing up when he "saw Seago standing on the footboard." Sunderland was the only witness who said anything about Seago being on the footboard. It will be noted that Instruction 6 permits the jury to find that Seago's death was caused solely by "riding on the footboard." Assuming, without deciding, that it might be inferred from the evidence that Seago's death was caused by his *attempt* to get on or ride on the footboard, it certainly cannot be inferred from the evidence that his death was caused by *riding* on the footboard. There is no evidence to support such conclusion, yet the jury was, under Instruction 6, per-

mitted to speculate that the sole proximate cause of his death was his *riding* on the footboard. A finding based on speculation will not be permitted to stand. [Federal Cold Storage Co. v. Pupillo, 346 Mo. 136, 139 S. W. (2d) 996, l. c. 1001, and cases there cited.] It will be noted that Instruction 6 does not require a finding that defendant gave the hand lantern signal *and* that Seago's death was caused solely by "his own act in stepping on, or riding on" etc., so as to render harmless the submission without evidentiary support.

It is argued that Instruction 6 assumed that Seago stepped on, or was riding, or attempted to step on, or ride the footboard. We do not think that the instruction is susceptible of such construction. Neither is it an unwarranted comment on the evidence. A sole cause instruction must require a finding of the facts upon which it is based. [Dilallo v. Lynch, supra.] ·

 Instruction 4 follows: "The court instructs the jury that unless plaintiff has proven *to your satisfaction* by a preponderance or greater weight of the evidence that defendant did not give a proper hand lantern signal befofe said engine was started, then plaintiff cannot recover in this case and your verdict must be for the defendant" (italics ours).

The complaint on Instruction 4 is on the phrase *to your satisfaction.* It is contended that by the use of the phrase, the instruction required a higher degree of proof than the law requires. It must be conceded that such phrase is not necessary in a burden of proof instruction. Also, we might say that the phrase complained of was inserted, plaintiff says, with a blue pencil, in the typed instruction, and plaintiff contends that such character of insertion emphasized the phrase. A photostat of the instruction in the record shows a script insertion, but does not show color.

The phrase challenged here and similar ones, in burden of proof instructions, frequently have been before the courts of this State, but in no case has such phrase, standing alone, been held to constitute reversible error. Some of these cases and the alleged offending language follow. [Berry v. Wilson, 64 Mo. 164, "unless he satisfies the jury by a preponderance," etc.; Stewart v. Outhwaite et al., 141 Mo. 562, l. c. 571, 44 S. W. 326, "before he can recover you must be satisfied," etc.; McMahon v. Maccabees, 151 Mo. 522, l. c. 543, 52 S. W. 384, "the burden of proof is upon the defendant to show to the satisfaction of the jury," etc.; Norris v. St. Louis, I. M. & S. Ry. Co., 239 Mo. 695, l. c. 716, 144 S. W. 783, "the burden of proof rests upon the defendant to prove to your satisfaction," etc.; Shepard v. Schaff (Mo. Sup.), 241 S. W. 431, l. c. 432, "in order for you to find for plaintiff you must be satisfied," etc., "the entire evidence must satisfy you," etc.; Sisk v. Industrial Track Construction Co., 316 Mo. 1143, 295 S. W. 751, l. c. 754, "to your satisfaction by a preponderance or greater weight of the testimony;" Anderson

v. Voeltz (Mo. App.), 206 S. W. 584, l. c. 585, "to the 'satisfaction' of the jury by a preponderance of the evidence;" Krause v. Spurgeon (Mo. App.), 256 S. W. 1072, l. c. 1074, "burden is on the defendant to prove to your satisfaction and by a preponderance of the evidence;" Jackson v. City of Malden (Mo. App.), 72 S. W. (2d) 850, l. c. 856, "by a preponderance of the evidence to the satisfaction of the jury.]"

In Krause v. Spurgeon, supra, it was said that there was "no room or justification" for the extra requirement in the instruction, and because of the close case there, the instruction was held to be prejudicial.

In Nelson v. Evans, 338 Mo. 991, 93 S. W. (2d) 691, the challenged instruction contained the language, *negligence is a positive wrong*, and that if the truth of the charge of negligence *remains undetermined in your minds*, etc., and that the burden rests upon the plaintiff to prove the charge of negligence by a preponderance of the evidence to *the reasonable satisfaction* of the jury, etc. The first two italicized portions were specifically condemned, and the phrase, *to the reasonable satisfaction*, in its setting, was, in effect, condemned.

In the Nelson case the court quoted [93 S. W. (2d) l. c. 695] with approval from Rouchene v. Gamble Construction Co., 338 Mo. 123, 89 S. W. (2d) 58, l. c. 63, as follows: "Instructions on burden of proof should not state too many technical rules, and if an attempt is made to go into degrees of preponderance of evidence, it is almost certain to get the matter so complicated that a jury of laymen will have no idea at all as to what is meant. 'A short, simple instruction, telling the jury that the burden is on plaintiff to prove his case by a preponderance or greater weight of the credible evidence, and that unless he has done so the jury must find for defendant, ought to be sufficient to inform the jury what plaintiff is required to do. A plain declaration to that effect will be easily understood by a jury. The more the instruction is elaborated upon, the more complex it becomes and the more it is likely to be misunderstood.' [Mitchell v. Dyer (Mo. Sup.), 57 S. W. (2d) 1082, l. c. 1083; 23 C. J. 16, sec. 1749.] Certainly all that ought to be required, in addition to such a statement as to which party has this burden, should be a clear definition of preponderance of evidence, informing the jury that what is meant thereby is evidence which is more convincing to them as worthy of belief than that which is offered in opposition thereto."

Webster's New International Dictionary (2 Ed.), defines *satisfaction* as "the act of satisfying;" "the state of being satisfied;" and defines *satisfy* as "to free from doubt, suspense, or uncertainty;" "to give assurance to;" "to set at rest the mind of;" "to convince."

Such instruction as No. 4 has been, it seems, generally condemned. [See Endowment Rank of Order of K. P. v. Steele, 107 Tenn. 1, 8, 63 S. W. 1126, l. c. 1127; Hyndshaw v. Mills, 108 Neb. 250, 187 N.

W. 780, l. c. 781; Nabers v. Long, 207 Ala. 270, 92 So. 444; D'Antoni v. Teche Lines, 163 Miss. 668, 143 So. 415, l. c. 417; United Dentists, Inc., v. Commonwealth (Va.), 173 S. E. 508, l. c. 511; Western Cottage Piano & Organ Co. v. Anderson (Tex.), 101 S. W. 1061, l. c. 1064; Cleveland, C., C. & St. L. Ry. Co. v. Best, 169 Ill. 301, 48 N. E. 684, l. c. 687; Harig v. McCutcheon et al. (Ohio), 155 N. E. 701, l. c. 702; Midland Valley R. Co. v. Barnes et al., 162 Okla. 44, 18 Pac. (2d) 1089; Heacock v. Baule, 216 Iowa, 311, 249 N. W. 437, 93 A. L. R. 151, l. c. 154, Ann. 155-156; Hoffman v. Loud, 111 Mich. 156, 69 N. W. 231.]

In Endowment Rank of Order of K. P. v. Steele, supra, it is said: "It is not required that the evidence shall be clear and plain or that it shall satisfy any reasonable man. The word 'satisfy' means 'to free from doubt, suspense, or uncertainty; to set the mind at rest.' Now, it is necessary that the jury should be satisfied that there is a preponderance one way or the other, but this does not mean that it must be satisfied of the truth of the fact itself. . . . The law does not require that any theory or contention of either party in a civil suit shall be freed from doubt, suspense, or uncertainty; that the evidence must set the minds of the jury at rest; that it must be clear and plain; that it must be established, in the usual acceptation of that term; but merely that the contention shall be supported and made out by a preponderance of the testimony, although the jury may nevertheless have some doubt or uncertainty, and their minds may not be at rest, and the fact may not be certainly fixed." Similar reasoning appears in other cases cited, supra.

Since we have held that Instruction 6 was bad, it will not be necessary to specifically rule the assignment on Instruction 4. What we have said of this instruction ought to be a sufficient warning to the bar and trial courts to observe the admonition in the Rouchene case, supra, as to burden of proof instructions.

The judgment should be reversed and the cause remanded, and it is so ordered. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.